UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

J.M., as Administrator of the Estate of Her Son,
C.B.,

                                        Plaintiff,

vs.                                                                         1:20-CV-0091
                                                                            (GTS/CFH)
ASHLEY SESSIONS; ELISE M. WILLIAMS;
JOSHUA A. BUELL; COREY C. BEHLEN;
RAYMOND J. MCGINN; KATHERINA L.
CASSATA; and MICHAEL NOVACK,

                                        Defendants.
_____

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

Currently before the Court, in this case involving the death of C.B., a person residing in a

facility operated by the New York State Office for People with Developmental Disabilities

("OPDD"), are Defendants' motions for summary judgment  See dkt. # 118, 120.  For the reasons

set forth below, the motions are granted.

## I.        RELEVANT BACKGROUND

This case concerns the death of C.B., an individual residing at the Valley Ridge Center

for Intensive Treatment ("CIT") in Norwich, New York.  OPDD operated and staffed that facility.

Plaintiff, who was C.B.'s mother and is the Administrator of his estate, alleges that Defendants,

staff members at Valley Ridge CIT, violated D.B.'s rights by failing to provide him with

appropriate medical care.  More specifically, Defendants allegedly failed to respond to symptoms

indicating that C.B. was suffering from severe heart problems, failed to provide him with proper

treatment, and ignored his condition in a way that permitted D.B. to die in his bed without care

on April 8, 2018.  Based on these factual allegations, Plaintiff brings constitutional and state-law claims on D.B.'s behalf.

More specifically, Plaintiff's Amended Complaint, the operative pleading in this matter, raises three causes of action.  Count I, asserted against all Defendants pursuant to 42 U.S.C. § 1983 ("Section 1983"), claims that Defendants' conduct violated Plaintiff's Fourteenth Amendment substantive due process rights.  Count II, also asserted against all Defendants, claims negligence under state law.  Count III, asserted against three medical providers (Elise Williams, Raymond McGinn, and Michael Novack) claims medical malpractice under state law.

After Plaintiff served the Complaint on Defendants and Plaintiff filed the Amended Complaint, the parties engaged in discovery.  After the Court resolved preliminary issues and discovery closed, Defendants filed the current motion.  The parties have briefed the issues, and oral argument has been heard.

## II.    GOVERNING LEGAL STANDARD

It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a).  An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue.  Celotex

Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant is able to establish a prima facie basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

## III.   ANALYSIS

Defendant Ashley Simmons filed a motion for summary judgment.  Dkt. # 118.  She lost her job with the OPWDD shortly after the incident in question.  Defendants Corey C. Behlen, Joshua A Buell, Katherina L. Cassata, Raymond J. McGinn, Michael Novack, and Elise M. Williams also filed a motion for summary judgment.  Dkt. # 120.  Because this second group of Defendants were still OPWDD employees after the incident, the Court will refer to this group of Defendants as the "OPWDD Defendants."  After offering a recitation of the material facts occurring before D.B.'s death, the Court will address the motions in turn, as appropriate.

### A.   Material Facts[1]

---

[1]   Defendants filed their statements of material facts with citations to the record in support of their motions for summary judgment, and Plaintiff responded.  The Court will cite to the statements of the moving parties in support of the undisputed statements of fact and will note where the parties have created genuine disputes of material fact.  In responding to Defendants' motions, Plaintiff filed what the Court will liberally construe as a Statement of Additional Material Facts in Dispute, as permitted by Local Rule 56.1(b), even though she erroneously labeled it a "Statement of Material Facts."  Dkt. # 123.  The OPWDD Defendants filed a response to that statement.  Dkt. # 130.  The Court will use that statement and response as appropriate.

At the time of his death, C.B. resided at the Valley Ridge Center for Intensive Treatment ("CIT") in Norwich, New York.  Defendant Sessions's Statement of Material Facts ("Sessions Statement"), dkt. # 118-8, at ¶ 1.2. C.B. had been a Valley Ridge resident since May 19, 2015, when he submitted an Application for Voluntary Admission to Valley ridge.  OPWDD Defendants' Statement of Undisputed Material Facts ("OPWDD Defendants' Statement"), dkt. # 120-6, at ¶ 4.  Plaintiff disputes whether C.B.'s movements at Valley Ridge were restricted at the time of his death.  Plaintiff's Response to the OPWDD Defendants' Statement of Material Facts ("Plaintiff's Response to OPWDD Defendants' Statement"), dkt. # 123-2, at ¶ 4 (citing evidence supporting a finding that, "[l]ike all Valley Ridge CIT residents, C.B.'s movements were restricted and he could not see a medical provider without permission or go to a hospital without the approval of either the nursing staff or an on-call provider").  However, C.B. was still a resident of Valley Ridge on April 8, 2018.  Sessions' Statement at ¶ 8.  C.B. had "autism and Mood Disorder NOS, Impulse Control Disorder, Mild Mental Retardation, Antisocial Personality Disorder, and a history of closed head injury."  Plaintiff's Statement of Material Facts ("Plaintiff's Statement"), dkt. # 123, at ¶ 2.

Novack worked as a Developmentally Disabled Secure Care Treatment Aide ("DDSCTA") in April 2018.  Id. at ¶ 5.  At that time, Novack had responsibility for supervising all staff working at the Valley Ridge CIT E-House ("E-House").  Id. at ¶ 6.  Novack never looked at C.B.'s Plan of Nursing Services, even though the plan was stored in a book in E-House.  Id. at ¶ 7.  Novack never directed the staff he supervised to follow the services plan.  Id. at ¶ 8. Novack never had training on how to diagnose a medical condition.  Id. at ¶ 9.  Though OPWDD policy required that Valley Ridge CIT staff do "focus charting," Novack testified that he did not recall that term.  Id. at ¶ 10-11, OPWDD Defendants' Response to Plaintiff's Statement

("OPWDD Defendants' Response"), dkt. # 130, at ¶ 11.  Plaintiff claims that Novack never did any such charting.  Plaintiff's Statement at ¶ 11.  Novack could not recall discussing C.B.'s weight with anyone at OPWDD.  OPWDD Defendants' Statement at ¶ 12.

Defendant Katherina Cassata, who worked as a Developmental Disabilities Secure Care Treatment Aide ("DDSCTA") at the relevant time, observed C.B. "having difficulty completing his assigned chore of vacuuming" in the days before his death.  Id. at ¶ 53.  Plaintiff points out that Cassata testified that she saw C.B. become exhausted while vacuuming on April 4, 2018.  Plaintiffs' Response to OPWDD Defendants' Statement at ¶ 53.  She testified that C.B. told her that "he 'couldn't breathe.'" Plaintiff's Statement at ¶ 60.  C.B. also told her that his "'chest hurt'" and he was "'tired all the time.'" Id. at ¶¶ 61-62.  Cassata observed C.B. becoming exhausted from vacuuming; he told her "'I can't do it.'"  Id. at ¶ 63.  That comment struck Cassata as odd, because "'it wasn't like C.B. to not want to do something when [staff] asked him to do it.'" Id. at ¶ 64.  The parties disagree about whether Cassata documented or informed anyone about C.B.'s complaints on April 4, 2018.  Compare Plaintiff's Statement at ¶¶ 65-67 with OPWDD Defendants' Response at ¶¶ 65-67.

Cassata further testified that she again saw C.B. struggling to complete this task on April 6, 2018; she saw him "'sitting down in the chair trying to vacuum sitting down in the chair like scooching himself along.'" Plaintiff's Response to OPWDD Defendants' Statement at ¶ 53.  Such conduct was a "'dramatic change'" from how C.B. usually behaved.  Plaintiff's Statement at ¶ 76.  C.B. told Cassata that "he 'couldn't breathe.'" Id. at ¶ 68.  C.B. also complained to Cassata that "'he was having chest pains.'" Id. at ¶ 69.  C.B. appeared "'physically sick'" to Cassata.  Id. at ¶ 70.  Cassata thought C.B. had "'no color'" and "'was sweating.'"  Id. at ¶¶ 71-72.  Cassata observed that C.B. was "'clammy to the touch.'" Id. at ¶ 73.  Cassata also noted that

C.B. was "'out of breath." <u>Id.</u> at ¶ 74.  The parties dispute whether Cassata reported C.B.'s complaints about feeling ill to nursing staff.  <u>Compare</u> OPWDD Defendants' Statement at ¶¶ 54-55 <u>with</u> Plaintiff's Response to OPWDD Defendants' Statement at ¶¶ 54-55.  The parties dispute whether Cassata documented or informed anyone about C.B.'s difficulties vacuuming on April 8, 2018.  <u>Compare</u> Plaintiff's Statement at ¶¶ 77-79 <u>with</u> OPWDD Defendants' Response to Plaintiff's Statement at ¶¶ 77-79.

C.B. called his mother at 11:14 a.m. on April 8, 2018.  Plaintiff's Statement at ¶ 135.  He told her he had problems breathing and could not urinate.  <u>Id.</u>  C.B. had not made such complaints before.  <u>Id</u>. He hung up on his mother at the end of the call, something he had never done before.  <u>Id.</u>  Sensing that the situation was an emergency one, C.B.'s mother called Novack at 11:26 a.m.  <u>Id.</u> at ¶ 136.  She told Novack that C.B. "'was having problems breathing'" and "'couldn't pee.'"  <u>Id.</u>

On April 8, 2018, C.B. complained of difficulty voiding his bladder.  OPWDD Defendants' Statement at ¶ 11.  C.B. did not complain of any burning or discomfort while urinating.  <u>Id.</u> at ¶ 12.  Plaintiff adds that C.B. also complained that he had difficulty breathing, and points to evidence indicating that C.B. was "wheezing" and "having trouble breathing."  Plaintiff's Response to OPWDD Defendants' Statement at ¶ 11; <u>see also</u> Defendant Sessions's Statement of Material Facts ("Sessions's Statement"), dkt. # 118-8, at ¶ 9 and Plaintiff's Response to Sessions's Statement, dkt. # 123-1, at ¶ 9.  Plaintiff further contends that other reports indicate that C.B. was "antsy" during the day, had asked "'more than once'" to see a nurse.  <u>Id.</u>  C.B. allegedly told Defendant Michael Novack, who was working at Valley Ridge as a Disabilities Secure Treatment Aid ("DDSCTA") II on April 8, 2018, that he needed to go to the hospital.  <u>Id.</u>; <u>see also</u> OPWDD Defendant's Statement at ¶ 56 for Novack's title.  Plaintiff

further alleges that Williams did not take any history from C.B. on April 8, and did not listen to his heart.  Id.

Williams observed that C.B. had "sinus congestion."  OPWDD Defendants' Statement at ¶ 13.  Plaintiff contends that C.B.'s condition did not involve sinus congestion, but instead amounted to "wheezing" and "trouble breathing."  Plaintiff's Response to OPWDD Defendants' Statement at ¶ 13.  Plaintiff also contends that Williams "failed to ask C.B. or anyone else when his symptoms started and therefore failed to discover that he had been having chest pains for days" and that he had also experienced difficulty breathing and was "'tired all the time.'"  Id.  Williams asked C.B. if he had been taking the cough syrup available to him as needed, and C.B. said that he had.  OPWDD Defendants' Statement at ¶ 14.  At 2:30 p.m. on April 8, 2018, Williams saw C.B. at a clinic located in a separate building at Valley Ridge.  Id. at ¶ 15.  Williams observed C.B. breathing heavily during his walk from E House to the clinic, but noted that his breathing "normalized" after he arrived there.  Id. at ¶ 16.  Plaintiff alleges that these difficulties had been occurring days before C.B.'s visit to the clinic, and that Williams did nothing to determine the source of these issues.  Plaintiff's Response to OPWDD Defendants' Statement at ¶ 16.  Williams took C.B.'s vital signs, which were in the normal range.  OPWDD Defendants' Statement at ¶ 17.  Plaintiff notes that Williams did not take C.B.'s respiratory rate.  Plaintiff's Response to OPWDD Defendants' Statement at ¶ 17.  While Defendants claim that Williams listened to C.B.'s lungs, and that they were clear, Plaintiff responds that Williams lacked the skills to assess whether C.B. had clear lungs, and that, as a Registered Nurse "[i]t was even illegal for her to diagnose a medical condition."  OPWDD Defendants' Statement at ¶ 18; Plaintiff's Response to OPWDD Defendants' Statement at ¶ 18.  The parties agree that Williams

examined C.B.'s bladder, finding that it was not distended and that palpitation did not cause any complaints or discomfort.  OPWDD Defendants' Statement at ¶ 19.

Williams encouraged Plaintiff to rest and drink fluids.  Id. at ¶ 20.  She also encouraged him to request another dose of cough syrup to treat his congestion.  Id.  She did not receive any other calls or complaints concerning C.B. on April 8, 2018.  Id.  Williams ended her shift at 5 p.m. on April 8, and did not hear about C.B.'s condition until she learned of his death when she returned to work on April 10, 2018.  Id. at ¶¶ 21-22.

Defendant Ashley Sessions was a DDSCTA trainee on April 8, 2018.  Sessions' Statement at ¶ 2.  Her job duties included "direct care and supervision of Valley Ridge residents."  Id. at ¶ 3. Plaintiff contends that Sessions's duties also included making a note about each resident at least once a day, making herself familiar with C.B.'s plan of nursing services, and reporting to nursing staff.  Plaintiff's Response to Session's Statement at ¶ 3.  Plaintiff further alleges that Sessions had a duty to report if C.B. demonstrated symptoms such as "difficulty tolerating activity, . . . shortness of breath, or tiring easily."  Id.  Sessions did not have medical training.  Sessions's Statement at ¶ 4.  She was however, trained in CPR and had CPR certification.  Plaintiff's Response to Sessions's Statement at ¶ 4.

Sessions worked an overnight shift from 11:00 p.m. to 7 a.m. at E House at Valley Ridge on April 8-9, 2018.  Sessions's Statement at ¶ 5.  When Sessions arrived for her shift on August 8, she spoke to staff who were leaving "about issues that had occurred on the previous shift." Plaintiff's Statement at ¶ 81.  As part of her duties, Sessions was required to conduct bed checks of all E House residents. Sessions' Statement at ¶ 6.  Facility policy required Sessions to "make sure that the resident was in bed and in a safe position" when she did the bed checks.  Id. at ¶ 7. Employees did not ordinary expect to enter the room and conduct a more extensive check.  Id.

Such checks were required only when "the treatment team had identified" a resident "as presenting 'medical or intense needs.'" Id.  Plaintiff points out that part of Sessions jobs during such checks was to "make sure individuals were 'in their room and safe.'" Plaintiff's Response at ¶ 7.  Still, C.B.'s treatment team had not identified any "'medical or intense needs'" for C.B. on April 8, 2018.  Sessions's Statement at ¶ 12.

Sessions contends that facility policy required her only to "perform ordinary, visual bed checks" for C.B. on the night of April 8-9, 2018.  Id. at ¶ 13.  Sessions performed the required bed checks at 11:00 p.m. and 1:00 a.m. on April 8 and April 9, 2018.  Id. at ¶ 14.  Policy required her to perform additional checks at 3 a.m. and 5 a.m. on that day.  Id.  Sessions did not make these checks, though she recorded that she had done so.  Id.  Sessions also lied to New York State investigators when she claimed that she had done the bed checks.  Plaintiff's Statement at ¶ 87.  Sessions testified that she had not performed the bed checks "because she 'was watching movies' and 'was distracted.'"  Id. at ¶ 85.  She also recorded that C.B. had risen at 1:00 a.m. to use the bathroom.  Sessions' Statement at ¶ 14.  Sessions testified that when she performed a bed check she "would 'click their door open, open their door, make sure they were in their room and safe.'"  Plaintiff's Statement at ¶ 90.

Corey Behlen worked as Head of Shift at the Valley Ridge CIT for the evening and night shifts on April 8-9, 2018.  Id. at ¶ 91.  He was in E-House from around 3:00 a.m. until 5:30 a.m. on April 9, 2018.  Id. at ¶ 92.  Behlen was watching t.v. in E-House during the early morning hours of April 9, 2018.  Id. at ¶ 93.  Behlen saw Sessions on the computer at that time.  Id. at ¶ 94.  Behlen did not look to determine whether Sessions completed her bed check forms at that time.  Id. at ¶ 95.  Behlen testified that he allowed staff he supervised to watch television and movies during overnight shifts.  Id. at ¶ 96.  Behlen was not allowed to work as the head of shift

from April 9, 2018 to September 10, 2018, "'because of what happened around C.B.'s death.'" Id. at ¶ 97.  Behlen also faced "'supervisory'" checks during that period because of those events. Id. at ¶ 97.  Watching television for 2-3 hours during a shift was not part of Behlen's duties as supervisor.  Id. at ¶ 98.

Jennifer Smith, an OPWDD staff member, attempted to waken C.B. for his morning medication at 6:30 a.m. on April 9, 2018.  Sessions's Statement at ¶ 15.  She found him lying on his back.  Id.  When she touched C.B., she discovered he was dead.  Id.  C.B. was cold to the touch and his lips were blue. Plaintiff's Statement at ¶ 162.  C.B. had "'2+ pitting edema bilaterally'" when he died.  Id. at 132.  The parties agree that the edema had developed in the days preceding C.B.'s death, but dispute whether Defendants' were aware of and ignored this condition.  Compare Plaintiff's Statement at ¶ 133 with OPWDD Defendants' Response to Plaintiff's Statement at ¶ 133.  Plaintiff claims that the edema was present when Williams examined C.B. on April 8, 2018.  Plaintiff's Statement at ¶ 134.  The OPWDD Defendants point out that Williams "did not observe signs of edema during her examination."  OPWDD Defendants' Response at ¶ 134.  A medical examiner, Dr. John N. Cruz, performed a post-mortem examination of C.B.  Sessions's Statement at ¶ 17.  Cruz concluded that C.B. likely died between 4:30 a.m. and 6:30 a.m. on April 9, 2019.  Id.  Cruz further found that "C.B. 'died from idiopathic or viral cardiomyopathy and was in heart failure at the time of his death.'" Id.  Dr. Cruz "concluded that C.B. had been suffering from this condition for months and was on the night of his death experiencing pulmonary edema[.]"  Id.  The parties dispute how long C.B. had been experiencing this condition, and the ease with which that condition could have been diagnosed.  Compare id. at ¶ 17 with Plaintiff's Response to Sessions's Statement at ¶ 17.

Valley Ridge CIT is surrounded by a fence.  Plaintiff's Statement at ¶ 163.  Plaintiff contends that residents at Valley Ridge are not permitted to come and go as they please.  Id. at ¶ 164.  The OPWDD Defendants dispute this claim to the extent that Plaintiff "suggests that C.B. was on involuntary legal status" at the time of his death.  OPWDD Defendants' Response at ¶ 164.  Plaintiff further contends that "C.B. could not go see a medical provider by himself."  Plaintiff's Statement at ¶ 165.  Defendants again respond that nothing indicates that C.B. was involuntarily confined at Valley Ridge.  OPWDD Defendants' Response at ¶ 165.  Plaintiff alleges that C.B. could not decide himself to go to the hospital, and that no resident at Valley Ridge could go to the emergency room without getting approval from nursing staff or an on-call provider.  Plaintiff's Statement at ¶¶ 166-167.  Defendants again point out that they "dispute [the claim] insofar as this statement suggests that C.B. was on involuntary legal status."  Defendants' Response at ¶¶ 166-167.  Indeed, if a Valley Ridge resident called 911 in April 2018, that call would be routed to the Valley Ridge safety department.  Plaintiff's Statement at ¶ 168.

> **B.    Plaintiff's Federal Claim**

The current action contains a single federal claim, brought pursuant to Section 1983.  Plaintiff claims that Defendants violated "an affirmative duty to care for and protect C.B. under the Due Process Clause of the Fourteenth Amendment" and seeks a recovery for violation of C.B.'s substantive due process rights.  Because the other claims before this Court rely on supplemental jurisdiction, the Court will first address those aspects of Defendants' motions for summary judgment that regard Plaintiff's federal claim.  In doing so, the Court will concentrate

on the arguments of the OPWDD Defendants, because the Court finds them dispositive of the issue.[2]

Defendants argue that they had no duty to C.B. under federal law because C.B. was a voluntary resident at Valley Ridge, and therefore cannot be liable for violating his substantive due process rights under Section 1983. Plaintiff does not successfully dispute that C.B. was a voluntary resident at Valley Ridge. Instead, she attempts to dispute the legal significance of that status.

Plaintiff asserts a substantive due process claim concerning the care that C.B. received at Valley Ridge. In discussing the Due Process Clause, the Supreme Court has emphasized that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." Matican v. City of New York, 524 F.3d 151, 155 (2d Cir. 2008) (quoting DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189, 195 (1989)). Thus, "[a]s a general matter, the state is under no constitutional duty to provide substantive services to free persons within its borders." Charles v. Orange Cty., 925 F.3d 73, 81-82 (2d Cir. 2019). If "a person is held in state custody, and thus wholly dependent on the state," however, "the state takes on an affirmative duty to provide for his or her 'safety and general well-being.'" Charles, 925 F.3d at 82 (quoting DeShaney, 489 U.S. at 199-200). "This 'special relationship exception' imposes a duty on the state in recognition of 'the limitation which [the state] has imposed on [the person's] freedom to act on his own behalf.'" Id. (quoting DeShaney, 489 U.S. at 200). "'When the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and

---

[2]     Plaintiff does not oppose the OPWDD Defendants' motion with reference to Defendant Joshua Buell. Because that aspect of the OPWDD Defendants' motion is supported by at least facial merit, that aspect of the motion will be granted and Buell dismissed from the action.

at the same time fails to provide for basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the . . . Due Process Clause.'" Jacobs v. Ramirez, 400 F.3d 105, 106 (2d Cir. 2005) (quoting DeShaney, 489 U.S. at 200).   The Second Circuit has "generally 'focused on involuntary custody as the linchpin of any special relationship exception.'"   Brown v. City of New York, 786 F. App'x 289, 293 (2d Cir. 2019) (quoting Matican, 524 F.3d at 156); see also Brooks v. Giuliani, 84 F.3d 1454, 1466 (2d Cir. 1996) (rejecting idea that the State had a substantive due process obligation to certain disabled plaintiffs living in state-financed facilities because they were "under no state-imposed restraint")).[3]

As stated earlier, Plaintiff does not deny that C.B. was a voluntary resident of Valley Ridge, but argues that the fact that he was not in custody does not undermine his right to due process protections during his time in the facility.   In support of this argument, Plaintiff points to Soc'y for Good Will to Retarded Children, Inc. v. Cuomo, 737 F.2d 1239, 1245 (2d Cir. 1984), for the proposition that people with developmental disabilities in state facilities have a substantive due process right to adequate food, shelter, clothing, and medical care "whether an

---

[3]     In explaining why substantive due process protections apply only when the State has taken people into involuntary custody, the Brooks Court quoted DeShaney:

> The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expression of intent to help him, but from the limitations which it has imposed on his freedom to act on his own behalf.  In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—with the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protection his liberty interests against harms inflicted by other means.

Brooks, 84 F.3d at 1466 (quoting DeShaney, 489 U.S. at 200.

individual is placed in state custody 'voluntarily' or 'involuntarily.'"  Plaintiff's Brief in

Opposition, dkt. # 122, at 11, n.7.  Plaintiff points as well to other cases that appear to apply due

process protections to people residing voluntarily in state institutions.  See West v. Whitehead,

No. 04-CV-9283, 2008 WL 4201130, at *14 (S.D.N.Y. Sept. 11, 2008) (discussing the

substantive due process rights of plaintiffs in state institutions for developmentally disabled

individuals, and finding "the Second Circuit and other courts within the Second Circuit have

interpreted *Youngberg* [*v. Romeo*, 457 U.S. 307 (1982)] to apply to certain categories of people

who are voluntarily committed to a state institution");[4] Conn. Traumatic Brain Inj. Assoc. v.

Hogan, 161 F.R.D. 8, 10 (D Conn. 1995) (refusing to alter a class certification for regarding

treatment of "completely dependent individuals" who were housed in state institutions to exclude

from due process protection those who were voluntarily housed); LaRock v. Albany Cnty.

Nursing Home, No. 19-CV-604, 2020 WL 1530792, at *4 (N.D.N.Y. Mar. 31, 2020) (Sharpe, J.);

Spiezio v. Martinez, 653 F. Supp.3d 8, 29 (N.D.N.Y. 2023) (Kahn, J.).[5]

---

[4]    West case does not address how DeShaney effected those referenced holdings or
subsequent cases that make the involuntary nature of custody a component of the due process
analysis.

[5]    In Spiezio, the plaintiff's decedent "was involuntarily committed to the custody of
OPWDD due to his developmental disabilities."  Spiezio, 653 F.Supp.3d at 14.  U.S. District
Judge Lawrence E. Kahn used Youngberg v. Romeo, 457 U.S. 307 (1982), to find that
"involuntarily committed developmentally disabled people have a liberty interest (1) in the safe
conditions and (2) in freedom from bodily restraint under the Fourteenth Amendment[.]"  Id. at
18.  He then discussed what standard the conduct of defendants in cases of persons involuntarily
committed to institutions like those operated by OPWDD should face:  "the professional
judgment standard, the deliberate indifference standard, or the shocks the conscience standard[.]"
Id. at 19.  The potion of the decision to which Plaintiff points addresses a substantive due process
claim based on special relationship liability/state created danger theory.  Judge Kahn notes that
Youngberg addressed action by a state actor, and DeShaney dealt with a private actor harming a
plaintiff.  Id. at 29.

Plaintiff's argument is thus that the requirement that a plaintiff be in involuntarily custody to implicate substantive due process for a failure to provide care applies only in situations where a third party injuries the plaintiff.  While such a reading of the cases is not entirely unreasonable, the Court finds that Defendants have the better argument.  DeShaney came seven years after Youngberg v. Romeo, 457 U.S. 307 (1982), and the Supreme Court in DeShaney found that the Due Process Clause does not create a clear right to government aid without affirmative government action that puts the injured person in the government's custody. See DeShaney, 489 U.S. at 200 ("[I]t is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protection his liberty interests against harms inflicted by other means.").  Here, C.B., and/or those caring for him, voluntarily acceded to state custody. The state did not restrain C.B.'s liberty by ordering him into custody, and his voluntary presence at Valley Ridge (even with usual restrictions on his movement) does not implicate Due Process.

In Brown, the Second Circuit concluded that an individual seeking the protection of substantive due process while in a state facility must demonstrate that the person was in the custody of the State:

> Brown's reliance on *Soc'y for Good Will* is unpersuasive.  That case – decided five years before the Supreme Court decided *DeShaney* – is not applicable here.  In two decisions following *Soc'y for Good Will*, this Court has distinguished that case and clarified the due process rights protected after *DeShaney*.  *See Suffolk Parents of Handicapped Adults v. Wingate*, 101 F.3d 818, 823 (2d Cir. 1996) (holding that Due Process Clause confers no affirmative right to governmental aid and recognizing only one exception to this rule:  "when the state takes a person into its custody and holds *him there against his will*" (emphasis in original) (internal quotations omitted)); *Brooks v. Giuliani*, 84 F.3d 1454, 1466 (2d Cir. 1996) (holding that "involuntary nature of the commitment was determinative" to Supreme Court's analysis of special-relationship

exception).  There, this Court has generally "focused on involuntary custody" in analysis of special relationship exception).  *See Matican*, 524 F.3d at 156.  Because Brown failed to allege facts showing she was involuntarily held in custody.  Brown failed to establish a special relationship.

Brown, 786 F. App'x at 293.  See also LaRock v. Albany Cnty. Nursing Home, No. 19-CV-0604, 2024 U.S. Dist. LEXIS 57018, at *9 (N.D.N.Y. Mar. 29, 2024) (Nardacci, J.) ("[T]he Due Process Clause imposes no affirmative duty on the states to provide adequate medical services to a person not held in state custody involuntarily, even if doing so is necessary to securing their life, liberty, or property."); [6] Passero v. Schulz, No. 17-CV-1296, 2018 U.S. Dist. LEXIS 133617,

---

[6]    As U.S. District Judge Anne M. Nardacci explained in a later decision in LaRock:

Plaintiff's reliance on *Society for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239 (2d Cir. 1984), for the proposition that the Constitution entitles voluntary residents of state facilities to adequate medical care, *see* Dkt. No. 114 at 13-15, is misplaced.  First, *DeShaney* was decided after *Society for Good Will*, and explicitly held that the affirmative duty to provide medical care only arises when the Sate restrains an individual's liberty and renders him unable to care for himself.  *See DeShaney*, 489 U.S. at 200 ("In the substantive due process analysis it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.").  Second, subsequent Second Circuit authority directly contradicts Plaintiff's use of *Society for Good Will*.  *See Brown v. City of New York*, 786 Fed.App'x 298, 293 (2d Cir. 2019) (recognizing that *DeShaney* was decided after and clarifies *Society for Good Will*, and reiterating that since *DeShaney* the Second Circuit has "focused on involuntary custody" to determine whether a constitutional duty to provide adequate care exists) (quoting *Matican*, 524 F.3d at 156; and citing *Suffolk Parents of Handicapped Adults v. Wingate*, 101 F.3d 818, 823 (2d Cir. 1996) (holding that the Due Process Clause confers no affirmative right to governmental aid and recognizing only one exception:  "when the State takes a person into its custody and *holds him there against his will*" (quoting omitted); *Brooks v. Giuliani*, 84 F.3d 1454,1466 (2d Cir. 1996) (holding that "involuntary nature of the commitment was determinative" to Supreme Court's analysis of special-relationship exception)).

LaRock, No. 19-CV-0604, 2024 U.S. Dist. LEXIS 57018 at *13 (N.D.N.Y. Mar. 29, 2024).

at *10-11 (N.D.N.Y. Aug. 6, 2018) (Hummel, M.J.) ("Here, even if Adult Protective Services was providing plaintiff with certain services and/or care, plaintiff was not involuntarily institutionalized nor does he demonstrate that he was otherwise involuntarily in state custody; thus, plaintiff has not demonstrated that he falls into the 'single exception' allowing for an affirmative duty pursuant to the Due Process Clause."), adopted, 2019 U.S. Dist. LEXIS 48588 (N.D.N.Y. March 25, 2019) (McAvoy, J.).  These cases guide the Court in this respect, and the Court must find that Plaintiff has not cited admissible evidence on which a reasonable juror could base a finding that Defendants violated his right to due process.  As a result, the Court must grant Defendants' motion in this respect.[7]

### C.    Plaintiff's State Law Claims

The Court hastens to add that, although it is granting Defendants' motion with respect to Plaintiff's federal claim, Plaintiff is not without a remedy for the conduct that allegedly led to C.B.'s death.  This is because Plaintiff also asserts state-law negligence and medical malpractice claims.  Having said that, the only basis for this Court's continuing jurisdiction over those claims–which all arise under New York law–is supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).  See 28 U.S.C. § 1367(a) (providing that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.").

---

[7]    Because the Court has concluded that no admissible record evidence supports Plaintiff's due process claim, the Court need not, and will not, address Defendants' alternative arguments for summary judgment, including their argument that qualified immunity protects them from liability as a matter of law.

Of course, a district court "may decline to exercise supplemental jurisdiction . . . if . . . (3) the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  Generally, when deciding whether to exercise supplemental jurisdiction, courts "must consider 'the values of judicial economy, convenience, fairness, and comity' . . . ." Kroshnyi v. U.S. Pack Courier Servs., 771 F.3d 93, 102 (2d Cir. 2014) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988)).  Moreover, generally, "if a plaintiff's federal claims are dismissed before trial, 'the state claims should be dismissed as well.'" Brzak v. UN, 597 F.3d 107, 113-114 (2d Cir. 2010) (quoting Cave v. E. Meadow Union Free Sch. Dist., 514 F.3d 240, 250 (2d Cir. 2008)).

Because the Court has dismissed the federal claims, and after carefully considering the factors of judicial economy, convenience, fairness, and comity, the Court will decline to address the state-law claims.  Simply stated, the remaining claims in this matter present issues that can best be addressed by a state court.  Pursuant to 28 U.S.C. § 1367(d), the statute of limitations on any such claims will be tolled for 30 days, unless New York law provides for a longer period.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motions for summary judgment, dkt. # 118, 120, are **GRANTED**; and it is further

**ORDERED** that Plaintiff's federal claims, and any claims against Defendant Buell, are **DISMISSED with prejudice**; and it is further

**ORDERED** that Plaintiff's remaining claims, which arise under state law and **DISMISSED without prejudice** to refiling in state court; and it is further

**ORDERED** the statute of limitations governing those state-law claims is **TOLLED** for **THIRTY (30) DAYS** pursuant to 28 U.S.C. § 1367(d).

Date:   July 11, 2024
        Syracuse, New York

Glenn T. Suddaby
U.S. District Judge