UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

J.M., as Administrator of the Estate of Her Son, C.B.,

Plaintiff,

vs. 1:20-CV-0091 (GTS/PJE)

ASHLEY SESSIONS; ELISE M. WILLIAMS; COREY C. BEHLEN; RAYMOND J. MCGINN; KATHERINA L. CASSATA; and MICHAEL NOVACK,

Defendants.

---

GLENN T. SUDDABY, United States District Judge

**DECISION and ORDER**

Currently before the Court, in this civil rights action filed by J.M. ("Plaintiff") on behalf of her son C.B. against six employees of a facility operated by the New York State Office for People with Developmental Disabilities arising from C.B.'s death while residing at that facility, are Defendants' supplemented motions for summary judgment. (Dkt. Nos. 118, 120, 152, 153.) For the reasons set forth below, Defendants' supplemented motions are granted in part and denied in part.

## I. RELEVANT BACKGROUND

Plaintiff's son, C.B., died while residing at a facility operated by the New York State Office for People with Developmental Disabilities ("OPWDD"), specifically, Valley Ridge Center for Intensive Treatment ("Valley Ridge") in Norwich, New York. C.B. had been residing at Valley Ridge because he suffered from autism, mood disorder NOS (not otherwise

specified), impulse control disorder, mild mental retardation, antisocial personality disorder, and a history of closed head injury. Following his death at age 34, an autopsy revealed that C.B. likely died of cardiomyopathy, a heart condition.

Generally, Plaintiff alleges that Defendants ignored C.B.'s pleas for help and obvious signs of heart failure, resulting in his death.[1] Based on these allegations, Plaintiff's Amended Complaint asserts three claims: (1) a claim that all Defendants violated Plaintiff's Fourteenth Amendment substantive due process rights under 42 U.S.C. § 1983; (2) a claim that all Defendants were negligent under state law; and (3) a claim that the three medical providers (Elise Williams, Raymond McGinn, and Michael Novack) committed medical malpractice under state law.

On July 11, 2024, the Court granted Defendants' motion for summary judgment on Plaintiff's Section 1983 claim and declined to exercise supplemental jurisdiction over her state law claims, because it found that C.B. had no substantive due process right to adequate medical care given that he had voluntarily admitted himself to the state-run facility. (Dkt. No. 133.)

On January 14, 2026, the Second Circuit vacated the Court's order and judgment because, under the Second Circuit's decision in *Society for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239 (2d Cir. 1984), C.B. was entitled to adequate medical care pursuant to the substantive guarantees of the Due Process Clause regardless of whether he was admitted to the facility by a court order or voluntarily. (Dkt. No. 138.) The Second Circuit then remanded

---

[1] Defendants are the following six individuals: (1) Ashley Sessions, a Developmentally Disabled Secure Care Treatment Aide trainee at Valley Ridge; (2) Elise M. Williams, a Registered Nurse at Valley Ridge; (3) Corey C. Behlen, Head of Shift at Valley Ridge; (4) Raymond J. McGinn, a Nurse Practitioner at Valley Ridge; (5) Katherina L. Cassata, a Developmentally Disabled Secure Care Treatment Aide at Valley Ridge; and (6) Michael Novack, a Developmentally Disabled Secure Care Treatment Aide and the CIT E-House Supervisor at Valley Ridge.

the matter for further proceedings in conformity with its opinion. (*Id.*)

On remand, the Court granted Defendants' request for leave to renew their motions for summary judgment, because (in its underlying Decision and Order of July 11, 2024) the Court had never addressed Defendants' alternative arguments for judgment as a matter of law. (Dkt. Nos. 145, 146, 148, 149, 151) However, to lighten the burden on the parties, the Court permitted them to cite record evidence previously filed on the docket with regard to the original motions for summary judgment. (Dkt. No. 151.)

All Defendants have filed renewed motions for summary judgment. (Dkt. Nos. 152, 153.) Plaintiff has filed a combined opposition. (Dkt. No. 156.) All Defendants have filed replies. (Dkt. Nos. 157, 158.) On August 26, 2026, the Court held oral argument. (Dkt. No. 160.) Following oral argument, the Court reserved decision and indicated that a written Decision and Order would follow. This is that Decision and Order.

## II. GOVERNING LEGAL STANDARDS

### A. Procedural Standard

For the sake of brevity, the Court will not recite the well-known standard governing motions for summary judgment, but will respectfully refer the parties (for whom this Decision and Order is intended) to Part II of the Court's recent decision in *Keneston v. N.Y.S. Office of State Comptroller*, 24-CV-0136, 2026 WL 1480354, at *15-16 (N.D.N.Y. May 27, 2026), which accurately recites that standard.

**B. Substantive Standard**

**1. Federal Inadequate Medical Care Claim by a Civilly Committed Individual Under the Substantive Due Process Clause and Section 1983**

This Court has previously noted that some courts within the Second Circuit have acknowledged that it is unclear whether a federal inadequate medical care claim by civilly committed individual should be analyzed under (1) a deliberate indifference standard, (2) a general substantive due process analysis, or (3) a substantial departure standard. *Wood v. Sullivan*, 21-CV-0107, 2021 WL 12318011, at *7, n.5 (N.D.N.Y. Mar. 29, 2021) (Suddaby, C.J.) (citing cases). However, this Court has also noted that, because the Second Circuit has made clear that deliberately indifferent conduct is "egregious enough" to state a substantive due process claim, a court need not conduct a separate analysis (i.e., over and above the deliberate indifference analysis) of whether the state's conduct "shocks the conscience" (for purpose of a general substantive due process analysis). *Wood*, 2021 WL 12318011, at *7, n.5 (citing *Charles v. Orange Cnty*., 925 F.3d 73, 86 [2d Cir. 2019]); *see also Bolmer v. Oliveira*, 594 F.3d 134, 144 (2d Cir. 2010) ("A substantial departure from those standards shocks the conscience because it removes any '*reasonable* justification' for intentionally depriving the person of his or her liberty.") (emphasis in original).

As a result, the Court will confine its recitation of the standards governing Plaintiff's federal claim to a recitation of the deliberate indifference standard and a recitation of the substantial departure standard. Before beginning that recitation, however, the Court will pause to observe only that the Second Circuit has described the "substantial departure from professional judgment" standard as requiring "more than simple negligence . . . but less than

deliberate indifference." *Kulak v. City of N.Y.*, 88 F.3d 63, 75 (2d Cir. 1996).

**a. Deliberate Indifference Standard**

Generally, the deliberate indifference standard, which applies to decisions made by non-professionals, involves two requirements.[2] "First, the alleged deprivation must be, in objective terms, sufficiently serious." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (internal quotation marks omitted). "In most cases, the actual medical consequences that flow from the denial of care are highly relevant in determining whether the denial of treatment subjected the detainee to a significant risk of serious harm." *Charles v. Orange Cnty.*, 925 F.3d 73, 86 (2d Cir. 2019).

Second, "the defendant must act with a sufficiently culpable state of mind." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks omitted). This element is satisfied where the official acted with *objective* recklessness. *Darnell v. Pineiro*, 849 F.3d 17, 32, 35 (2d Cir. 2017); *D.K. by L.K. v. Teams*, 260 F. Supp. 3d 334, 354 (S.D.N.Y. 2017). To show this state of mind, a plaintiff must prove that "the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35; *cf. Charles*, 925 F.3d at 87 ("[A] detainee asserting a Fourteenth Amendment claim for deliberate indifference to his medical needs can allege either that the defendants *knew* that failing to provide the complained of medical treatment would pose a substantial risk to [plaintiff's] health or . . . *should have* known that failing to provide the omitted medical treatment would pose a substantial risk to [plaintiff's] health.") (emphases in original).

---

[2] For a definition of a "professional," see below Part II.A.2. of this Decision and Order.

This state of mind is one more blameworthy than negligence. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Rather, deliberate indifference is a state of mind akin to criminal recklessness. *Farmer*, 511 U.S. at 827; *Wilson v. Seiter*, 501 U.S. 294, 301-03 (1991); *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006); *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir. 1998); *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).

**b. Substantial Departure Standard**

The substantial departure standard applies to decisions "made by a professional." *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982). Such a "professional" is defined as "a person competent, whether by education, training or experience, to make the particular decision at issue." *Youngberg*, 467 U.S. at 323 n.30. For example, "[l]ong-term treatment decisions normally should be made by persons with degrees in medicine or nursing, or with appropriate training in areas such as psychology, physical therapy, or the care and training of the retarded." *Id*. Meanwhile, "day-to-day decisions regarding care—including decisions that must be made without delay—necessarily will be made in many instances by employees without formal training but who are subject to the supervision of qualified persons." *Id*.

Generally, this standard asks whether the defendant's conduct "is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg*, 457 U.S. at 323. In applying this standard, "courts must show deference to the judgment exercised by qualified professional[s]," whose decisions are entitled to a "presumption of correctness." *Id*. at 324. This is because "interference by the federal judiciary with the internal operations of these

institutions should be minimized. . . . [T]here certainly is no reason to think judges or juries are better qualified than appropriate professionals in making such decisions." *Id*. at 322-23. As a result, although courts must "make certain that professional judgment was in fact exercised . . . [i]t is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." *Id*. at 321 (internal quotation marks omitted).

The Second Circuit has characterized this standard as "essentially a gross negligence standard." *Doe v. N.Y.C. Dep't of Soc. Servs*., 709 F.2d 782, 790 (2d Cir. 1983). Gross negligence "is the kind of conduct where the defendant has reason to know of facts creating a high degree of risk of harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk." *Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014) (internal quotation marks omitted).

**c. Qualified Immunity**

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Williams v. Smith*, 781 F.2d 319, 322 (2d Cir. 1986) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 815 [1982]). As a result, a qualified immunity inquiry in a civil rights case generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff establish a constitutional violation"; and (2) "whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation confronted." *Sira v. Morton*, 380 F.3d 57, 68-69 (2d Cir. 2004) (citations omitted); *accord, Higazy v. Templeton*, 505 F.3d 161, 169, n.8 (2d Cir. 2007) (citations omitted).

Generally, in determining the second issue (i.e., whether it would be clear to a reasonable official that his conduct was unlawful in the situation confronted), courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir. 1991) (citations omitted), *cert. denied*, 503 U.S. 962 (1992); *see also Pena v. DePrisco*, 432 F.3d 98, 115 (2d Cir. 2005); *Clue v. Johnson*, 179 F.3d 57, 61 (2d Cir. 1999); *McEvoy v. Spencer*, 124 F.3d 92, 97 (2d Cir. 1997); *Shechter v. Comptroller of City of New York*, 79 F.3d 265, 271 (2d Cir. 1996); *Rodriguez v. Phillips*, 66 F.3d 470, 476 (2d Cir. 1995); *Prue v. City of Syracuse*, 26 F.3d 14, 17-18 (2d Cir. 1994); *Calhoun v. New York State Division of Parole*, 999 F.2d 647, 654 (2d Cir. 1993).

"As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton*, 505 F.3d 161, 169-70 (2d Cir. 2007) (citations omitted). This "objective reasonableness" part of the test is met if "[officials] of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *see also Anderson v. Creighton*, 483 U.S. 635, 639 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.'") (citation omitted); *Davis v. Scherer*, 468 U.S. 183, 190 (1984) ("Even defendants who

violate [clearly established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."); *Benitez v. Wolff*, 985 F.2d 662, 666 (2d Cir. 1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights"). As the Supreme Court has explained,

> [T]he qualified immunity defense . . . provides ample protection to all but the plainly incompetent or those who knowingly violate the law. . . . Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent [official] would have concluded that a warrant should issue; but if [officials] of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley*, 475 U.S. at 341; *see also Hunter v. Bryant*, 502 U.S. 224, 299 (1991) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.") (internal quotation marks and citation omitted).

**2. State Claims**

**a. Negligence**

Under New York law, negligence requires a plaintiff to establish "(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof." *Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000) (quoting *Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325, 424 N.E.2d 531, 535, 441 N.Y.S.2d 644 [N.Y.1981]).

"To establish a prima facie case of negligence, a plaintiff must demonstrate the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and that the breach was a

proximate cause of the plaintiff's injury. *Rushton v. New York*, 189 A.D.3d 1488, 1489 (N.Y. App. Div., 2d Dept. 2020). Where the plaintiff alleges more than one cause, the plaintiff "must generally show that the defendant's negligence was a substantial cause of the events which produced the injury." *Riccio v. Kid Fit, Inc.*, 126 A.D.3d 873, 874 (N.Y. App. Div., 2d Dept. 2015) (internal quotation marks omitted).

**b. Medical Malpractice**

"Under New York law, the requisite elements of proof in a medical malpractice action are (1) a deviation or departure from accepted practice, and (2) evidence that such departure was a proximate cause of injury or damage." *Torres v. City of N.Y.*, 154 F. Supp. 2d 814, 819 (S.D.N.Y. 2001) (citing *Lyons v. McCauley*, 675 N.Y.S.2d 375, 376 [N.Y. App. Div. 1998]).

"In determining whether an action sounds in medical malpractice or simple negligence, the critical question is the nature of the duty to the plaintiff which the defendant is alleged to have breached . . . . When the duty arises from the physician-patient relationship or is substantially related to medical treatment, the breach gives rise to an action sounding in medical malpractice, not simple negligence." *LaRusso v. St. George's Univ. Sch. of Med.*, 936 F. Supp. 2d 288, 304 (S.D.N.Y. 2013) (citing *Stanley v. Lebetkin*, 123 A.D.2d 854, 854 [N.Y. App. Div., 2d Dept. 1986]). Under New York law, such a "relationship is created when the professional services of a physician are rendered to and accepted by another person for the purposes of medical or surgical treatment . . . ." *Lee v. City of New York*, 162 A.D.2d 34, 36 (N.Y. App. Div., 2d Dept. 1990).

"[W]hen the gravamen of the complaint is not negligence in furnishing medical treatment to a patient, but rather a [provider's] failure to fulfill a different duty, the claim sounds in

negligence . . . ." *Dispenzieri v. Hillside Psychiatric Hosp.*, 724 N.Y.S.2d 203, 204 (N.Y. App. Div., 2d Dept. 2001).

## III. ANALYSIS

### A. Claims Against Defendant Ashley Sessions

#### 1. Substantive Due Process Claim

##### a. Substantial Departure Standard

Plaintiff argues that Defendant Sessions was a "professional" for purposes of *Youngberg* because she was competent, due to her training or experience, to make the decision to perform a bed-check of C.B. at 3:00 a.m. and 5:00 a.m. on the morning of C.B.'s death (which purportedly occurred at some point between 4:00 a.m. and 5:30 a.m. on April 9, 2018) to ensure that he was responsive and breathing. (Dkt. No. 156, at 20, 29-30 [citing pages 23, 93, and 97-101 of Sessions Depo. Tr., attached at Dkt. No. 118, Attach. 2, at 24, 94, 98-102].)

The problem with this argument is that, as of the morning of C.B.'s death, Defendant Sessions had received only the following training in performing bed-checks: (1) "[m]aybe a day" of training at Broome Development Center in performing bed-checks of individuals who were *immobile*, which involved "physically mov[ing] them"; and (2) approximately five months of "on-the-job training" at Valley Ridge in performing bed-checks of individuals who were mobile, such a C.B., which consisted of "shadow[ing] other staff members." (Dkt. No. 118, Attach. 2, at 98-102 [attaching pages 97 through 101 of Sessions Depo. Tr.].)[3] However, on the morning of

[3] According to Broome DDSO policy, a bed-check was a "visual check [to] assess[] that the individual is present in bed and appears comfortable"; and a "physical check of the individuals for appropriate status, i.e., skin color, respirations, elevated temperature, positioning and apparent comfort" was required only for individuals presenting "medical or intense needs." (Dkt. No. 119, Attach. 2, at 44; *also compare* Dkt. No. 118, Attach. 8, at ¶ 7 [Def. Sessions Statement of Facts, citing admissible record evidence supporting these facts] *with* Dkt. No. 123, Attach. 1, at ¶ 7 [Plf.'s Response, failing to cite citing admissible record evidence controverting

C.B.'s death, Defendant Sessions was not shadowing anyone. (*Id*. at 101.)

As a result, the Court has trouble finding that any rational fact-finder could conclude from the admissible record evidence that Defendant Sessions was competent, due to her training or experience, to make the decision to perform a bed-check of C.B. at 3:00 a.m. and 5:00 a.m. such that she could be held to the standard of a professional Developmentally Disabled Secure Care Treatment Aide.[4]

In any event, even if Defendant Sessions' conduct were held to the standard of such a "professional," the Court finds that her decision to not conduct a bed check of C.B. at 3:00 a.m. and 5:00 a.m. on the morning of his death, while arguably negligent, was not a *substantial* departure from accepted professional judgment, practice, or standards.

It is undisputed that, on the morning of C.B.'s death, Defendant Sessions had performed bed-checks of C.B. at 11:00 p.m. on April 8, 2018, and 1:00 a.m. on April 9, 2018. (*Compare* Dkt. No. 118, Attach. 8, at ¶ 14 [Def. Sessions' Statement of Facts, citing admissible record evidence supporting this fact] *with* Dkt. No. 123, Attach. 1, at ¶ 14 [Plf.'s Response, failing to deny, or cite admissible record evidence controverting, this fact]; *see also* Dkt. No. 118, Attach.

---

these facts].)

[4] The Court notes that Plaintiff cites *Parks v. Stevens*, 20-CV-06834, 2022 WL 61011, at *7 (W.D.N.Y. Jan. 6, 2022), for the point of law that, where defendants are "responsible for [an individual's] safety and were authorized to make decisions relative to protecting" that person, courts consider those individuals professionals subject to the professional judgment standard. (Dkt. No. 156, at 19-20.) However, the defendants in *Parks* were *supervisory* defendants, unlike Defendant Sessions, who was merely a non-supervisory *trainee*. *See Parks*, 2022 WL 61011, at *7 (W.D.N.Y. Jan. 6, 2022) ("Here, Plaintiff has adequately pleaded factual allegations that allow the Court to draw reasonable inferences that the Supervisory Defendants were responsible for Heather's safety and were authorized to make decisions relative to protecting her, and that their actions and omissions were substantial departures from professional judgment resulting in injury and death."). Furthermore, Plaintiff does not specify what "decisions" Sessions was authorized to make decisions "relative to protecting" C.B. (*See generally* Dkt. No. 156, at 19-20.)

2, at 45 [attaching page 44 of Sessions Depo. Tr., stating that she does not remember lying to investigators about the 1:00 a.m. bed-check].) It is also undisputed that, when Defendant Sessions performed her bed-check at 1:00 a.m., C.B. had been up to use the bathroom. (*Id.*)

Finally, it is undisputed that, during her shift, Defendant Sessions had not been informed of C.B.'s complaints during the day that he had trouble breathing (or any issues that occurred with regard to C.B. during the previous shift). (*Compare* Dkt. No. 118, Attach. 8, at ¶¶ 10-11 [Def. Sessions' Statement of Facts, citing admissible record evidence supporting this fact] *with* Dkt. No. 123, Attach. 1, at ¶¶ 10-11 [Plf.'s Response, not citing any admissible record evidence controverting his fact].)

Although Plaintiff cites page 86 of Defendant Sessions' deposition transcript for the assertion that "Sessions spoke to the staff she was relieving and was told about issues that had occurred on the previous shift" (Dkt. No. 123, Attach. 1, at ¶ 11 [Plf.'s Response]), that page only supports the fact that, at the beginning of her shift, Sessions was "supposed to [have a quick conversation] with the person [she was] relieving to discuss whether there had been any issues during the prior shift," during which quick meeting it was Sessions' "expectation that if there had been any issues during the prior shift, then the person [she was] relieving would tell [her] about them." (Dkt. No. 124, Attach. 12, at 15 [attaching page 86 of Sessions Depo. Tr.].) Moreover, the next three pages of Defendant Sessions' deposition transcript reveal that, when asked directly, Defendant Sessions testified that, upon arriving for her evening shift on April 8, 2018, she was not informed by anyone C.B. had not been feeling well that day or that he had been to the clinic that day. (Dkt. No. 118, Attach. 2, at 88-90 [attaching pages 87 through 89 of Sessions Depo. Tr.].)

Furthermore, Plaintiff argues that Defendant Sessions "was responsible for knowing the medical conditions of all the residents in E-House, including C.B. . . . And she was supposed to be familiar with his paperwork, including his Plan of Nursing Service." (Dkt. No. 156, at 30.) However, C.B.'s Plan of Nursing Service did not state that C.B. had difficulty breathing; rather, it stated that any such difficulty should be reported to a nurse. (*See generally* Dkt. No. 125, Attach. 9, at 2-3.) Moreover, C.B.'s paperwork did not state that C.B. had difficulty breathing on April 8, 2018, but merely contained (1) a notation by Defendant Williams that C.B. had "sinus congestion," and (2) a notation by Defendant Cassata at the end of her daily activity report (or "DAR") that C.B. was "having trouble breathing." (*See generally* Dkt. No. 119, Attach. 2, at 10; Dkt. No. 121, Attach. 7, at 65; Dkt. No. 125, Attach. 4.) Furthermore, Defendant Sessions does not remember having seen any such notes. (Dkt. No. 118, Attach. 2, at 89-90 [testifying, "Not that I can remember"].) Moreover, it is undisputed that she had no medical training other than CPR. (*Compare* Dkt. No. 118, Attach. 8, at ¶ 4 [Def. Sessions' Statement of Facts, citing admissible record evidence supporting this fact] *with* Dkt. No. 123, Attach. 1, at ¶ 4 [Plf.'s Response, failing to cite citing admissible record evidence controverting this fact].)

Finally, the Court agrees with Defendant Sessions about the unpersuasiveness of Plaintiff's argument that Sessions' testimony that she was not aware of any of C.B.'s health problems "poses a credibility determination that should be left to the jury" (Dkt. No. 156, at 31, n.12): Sessions' testimony is not so problematic (by being [1] so completely uncorroborated by other record evidence and [2] so internally contradictory and/or incomplete) that it will be impossible for the Court, without rendering a credibility determination, to determine whether "the jury could reasonably find for the plaintiff," pursuant to *Jeffreys v. City of New York*, 426

F.3d 549, 554 (2d Cir. 2005). (Dkt. No. 157, at 8.) The fact that Sessions initially lied under oath to investigators in a sworn statement later in the morning after C.B.'s death does not render her testimony in this action internally contradictory, given that she corrected that lie later that day (and well before her deposition in this action). (Dkt. No. 118, Attach. 2, at 24-40 [attaching pages 23 through 39 of Sessions Depo. Tr.].) Indeed, to let the case go to the jury on this claim based on the current record, the Court would be improperly rendering a credibility determination.

Simply stated, under the circumstances, insufficient reason exists to elevate Defendant Sessions' decisions to watch television instead of performing bed checks at 3:00 a.m. and 5:00 a.m. to the level of gross negligence (i.e., beyond the level of simple negligence).

**b. Deliberate Indifference Standard**

Because the Court has found that Defendant Sessions' conduct could not reasonably be found to meet the substantial departure standard (and because that standard requires less than the deliberate indifference standard), the Court finds that Defendant Sessions' conduct could not reasonably be found to meet the deliberate indifference standard (which contains a required mental state that is akin to criminal recklessness).

**c. Qualified Immunity**

Because the Court has found that no reasonable juror could find Defendant Sessions liable on Plaintiff's substantive due process claim, the Court need not apply the doctrine of qualified immunity to that claim.

**2. Negligence Claim**

Defendant Sessions argues that she is also entitled to judgment as a matter of law on Plaintiff's state-law negligence claim against her because, based on the current record, no

reasonable fact-finder could conclude that Sessions' failure to perform a bed check at 3:00 a.m. and 5:00 a.m. was a proximate cause of C.B.'s death. (Dkt. No. 152, Attach. 1, at 22-24; Dkt. No. 157, at 9.) In doing so, Defendant Sessions relies on the following: (1) the "subtle manner" in which pulmonary edema can present itself (even to a "very good clinician"); (2) the fact that the exact time of C.B.'s death is unknown; and (3) the purported lack of "credible evidence" that, had she performed her bed-check at 3:00 a.m. and/or 5:00 a.m., she would have, at that moment, witnessed C.B. experiencing distress (especially from her position standing in the doorway to his room, which is ordinarily her position during a visual bed-check). (Dkt. No. 152, Attach. 1, at 23-24 [citing *Liberty Mut. Ins. Co. v. Norton*, 219 A.D.3d 718, 718-719 (N.Y. App. Div. 2d Dept. 2023), and *Williams v. New York City Transit Auth.*, 175 A.D.3d 581, 584 (N.Y. App. Div. 2d Dept. 2019)].)

The problem with this argument is that admissible record evidence exists that, before his death (which occurred at some point between 4:00 a.m. and 6:30 a.m.),[5] C.B. "would have awoken . . . and experienced the sensation of drowning." (Dkt. No. 125, Attach. 13, at 8.) Granted, Plaintiff's expert does not appear to have opined regarding exactly how long C.B. would have experienced this sensation before he developed a fatal cardiac arrhythmia (due to his blood oxygen progressively falling). (*Id*. at 4, 8.)[6] Based on the report of Plaintiff's expert, the shortest period of this duration appears to have been "at least several minutes." (*Id*. at 8 ["The fastest pulmonary edema takes to develop is over the course of at least several minutes."].)

---

5 The medical examiner concluded that C.B. likely died between 4:30 a.m. and 6:30 a.m. (Dkt. No. 125, Attach. 18, at 2-3.) Plaintiff's expert concluded that C.B. died between 4:00 a.m. and 5:30 a.m. (Dkt. No. 125, Attach. 13, at 5.)

6 The Court notes that no transcript of any deposition of Plaintiff's testifying expert appears in the record. (*See generally* Docket Sheet.)

However, the longest period of this duration appears to have been "several days." (*Id*. at 6 ["The finding of 2+ pitting edema on autopsy indicates that [C.B. developed fluid accumulation over a period of several days."].)

Complicating the issue is the fact that Plaintiff's expert concluded that C.B. would not have survived if he had been discovered by someone less than an hour before his death. (Dkt. No. 125, Attach. 13, at 3.) However, again, his death could have occurred any time between 4:00 a.m. and 6:30 a.m., which means that, although Defendant Sessions' bed-checks at 3:00 a.m. and 5:00 a.m. (had she conducted them) could have been less than an hour before C.B.'s death and thus might not have resulted in his condition being discovered in time to prevent his death, the 3:00 a.m. bed-check certainly could have resulted in observing symptoms more than an hour before the time of death (were any such symptoms sufficiently apparent to be observable on a visual check from C.B.'s door), and the 5:00 a.m. bed-check similarly could have been timely if C.B.'s death did not occur until after 6:00 a.m.. Moreover, again, based on the report of Plaintiff's expert, C.B.'s experience of the sensation of drowning could have occurred between, at least, 3:00 a.m. and 5:00 a.m.

As a result, based on the current record, the Court finds a jury must decide whether Defendant Sessions would have observed C.B.'s discomfort if she had performed bed-checks at 3:00 a.m. and/or 5:00 a.m. (sufficient to establish the element of causation for purposes of a claim of negligence).[7]

---

[7] Again, as noted earlier, according to Broome DDSO policy, a bed-check was a "visual check [to] assess[] that the individual is present in bed and *appears comfortable*." *See, supra,* note 3 of this Decision and Order [emphasis added]. The Court further notes that, when she conducted bed checks of individuals residing at Valley Ridge CIT in April 2018, Defendant Sessions would "click their door open, open their door, [and] make sure that they were in their room and safe." (Dkt. No. 118, Attach. 2, at 94 [attaching page 93 of Sessions Depo. Tr.].) In addition, she would check if the individual was "responsive and breathing." (*Id*. at 24; Dkt. No.

### B. Claims Against Defendant Elise M. Williams

#### 1. Substantive Due Process Claim

##### a. Substantial Departure Standard

Plaintiff argues persuasively that Defendant Williams does not dispute that she was a "professional" for purposes of *Youngberg*. (Dkt. No. 156, at 27 n.11; *see also* Dkt. No. 120, Attach. 7, at 15-17; Dkt. No. 153, Attach. 1, at 12-13.)

Plaintiff argues further that Defendant Williams' treatment substantially departed from professional judgment in the following ways: (1) by failing to conduct a proper medical exam on April 8, including measuring C.B.'s respiratory rate, listening to his heart and/or performing an on-site EKG; (2) by failing to make a more thorough inquiry into C.B.'s symptoms and medical history; and (3) by not following up on his condition in any way during the remainder of her shift, by not alerting an on-call provider to C.B.'s condition, and/or by not ordering a medical bed check for C.B. on the night of April 8. (Dkt. No. 156, at 26-27.)

Defendant Williams argues that no reasonable fact-finder could find that her interactions with C.B. on April 8, 2018, show a substantial departure from professional judgment, because (1) the Court's inquiry is not to specify which of several professionally acceptable choices should have been made but only to look at whether there was a substantial departure from professional judgment, (2) here, there is no admissible record evidence establishing that Williams ignored any of the complaints or symptoms C.B. presented on April 8, 2018, or that any of these symptoms presented an "obvious likelihood" of serious illness. (Dkt. No. 153, Attach. 1, at 12-13, 24-25; Dkt. No. 158, at 3-5.)

The following facts are undisputed based on the current record. At some point on April

---

125, Attach. 6, at 2.)

8, 2018, Defendant Williams (as the registered nurse on duty at the time) was informed by direct care staff member Leisa McKown that C.B. was having difficulty breathing. (Dkt. No. 124, Attach. 22, at 12 [attaching page "59" of Leisa McKown Depo. Tr., answering "Yes" to the question "And you reported that to the nurse on April 8th, right?"]; Dkt. No. 130, at ¶¶ 13, 146 [Defs.' Response to Plf.'s Statement of Additional Material Facts in Dispute].) At the time, Defendant Williams was the primary point person for C.B.'s medical care and developed C.B.'s "plan of nursing services"; and she knew that he had been diagnosed with hypertension and that he had been putting on weight. (Dkt. No. 130, at ¶¶ 22, 24 [Defs.' Response to Plf.'s Statement of Additional Material Facts in Dispute, admitting facts].)

At approximately 1:30 p.m. on April 8, 2018, as part of her nursing rounds that day, Defendant Williams visited C.B. in the "E" House at Valley Ridge. (*Compare* Dkt. No. 120, Attach. 6, at ¶ 10 [Defs.' Statement of Facts, asserting and citing admissible record evidence supporting this fact] *with* Dkt. No. 123, Attach. 2, at ¶ 10 [Plf.'s Response, admitting this fact].) During that visit, C.B. complained to Defendant Williams of difficulty voiding his bladder, but did not complain of any pain or burning while urinating; and Williams observed what she believed was some sinus congestion. (*Compare* Dkt. No. 120, Attach. 6, at ¶¶ 11, 12, 13 [Defs.' Statement of Facts, asserting and citing admissible record evidence supporting these facts] *with* Dkt. No. 123, Attach. 2, at ¶¶ 11, 12, 13 [Plf.'s Response, failing to cite admissible record evidence controverting these facts].) She asked C.B. whether he had been taking cough syrup that was available to him as needed, and C.B. responded that he had. (*Compare* Dkt. No. 120, Attach. 6, at ¶ 14 [Defs.' Statement of Facts, asserting and citing admissible record evidence supporting these facts] *with* Dkt. No. 123, Attach. 2, at ¶ 14 [Plf.'s Response, admitting these

facts].) She told C.B. that she would examine him in the clinic.

At approximately 2:30 p.m., Defendant Williams saw C.B. in the clinic, which was located in a building separate from "E" House. (*Compare* Dkt. No. 120, Attach. 6, at ¶ 15 [Defs.' Statement of Facts, asserting and citing admissible record evidence supporting these facts] *with* Dkt. No. 123, Attach. 2, at ¶ 15 [Plf.'s Response, admitting these facts].)[8] When C.B. arrived at the clinic, Defendant Williams observed that C.B. was breathing heavily, but she attributed that fact to his walk from "E" House to the clinic (which was about 100 yards long and uphill); and in any event his breathing normalized. (*Compare* Dkt. No. 120, Attach. 6, at ¶ 16 [Defs.' Statement of Facts, citing admissible record evidence supporting these facts] *with* Dkt. No. 123, Attach. 2, at ¶ 16 [Plf.'s Response, failing to cite admissible record evidence controverting these facts].) Defendant Williams does not recall taking any history from C.B. about a difficulty breathing. (Dkt. No. 121, Attach. 3, at 213.) Defendant Williams took C.B.'s vital signs except for his respiratory rate; and those vital signs were within normal limits. (*Compare* Dkt. No. 120, Attach. 6, at ¶ 17 [Defs.' Statement of Facts, citing admissible record evidence supporting these facts] *with* Dkt. No. 123, Attach. 2, at ¶ 17 [Plf.'s Response, failing to cite admissible record evidence controverting these facts].) She listened to his lungs and found them to be clear, in her opinion. (*Compare* Dkt. No. 120, Attach. 6, at ¶ 18 [Defs.' Statement of Facts, citing admissible record evidence supporting these facts] *with* Dkt. No. 123, Attach. 2, at ¶ 18 [Plf.'s Response, failing to cite admissible record evidence controverting these facts].) She also examined C.B.'s bladder, finding that it was non-distended with no complaints of discomfort on palpation. (*Compare* Dkt. No. 120, Attach. 6, at ¶ 19 [Defs.' Statement of Facts,

---

[8] Also attending the examination was Joshua A. Buell, who has been terminated as a Defendant. (Dkt. No. 133, at 18; Dkt. No. 156, at 18, n.6.)

asserting and citing admissible record evidence supporting these facts] *with* Dkt. No. 123, Attach. 2, at ¶ 19 [Plf.'s Response, admitting these facts].) She encouraged C.B. to rest and drink fluids, and to request another dose of cough syrup for his congestion. (*Compare* Dkt. No. 120, Attach. 6, at ¶ 20 [Defs.' Statement of Facts, asserting and citing admissible record evidence supporting these facts] *with* Dkt. No. 123, Attach. 2, at ¶ 20 [Plf.'s Response, admitting these facts].)

As stated above, during her examination of C.B., Defendant Williams did not check C.B.'s respiratory rate. (Dkt. No. 130, at ¶ 155 [Defs.' Response to Plf.'s Statement of Additional Material Facts in Dispute].) Defendant Williams also did not listen to C.B.'s heart or perform an EKG (with the machine that was on site). (Dkt. No. 130, at ¶¶ 25, 154 [Defs.' Response to Plf.'s Statement of Additional Material Facts in Dispute].) Furthermore, Defendant Williams did not observe signs of pulmonary edema during her examination of C.B., although it is undisputed that the edema developed over a period of several days leading up to C.B.'s death on the morning of April 9. (Dkt. No. 130, at ¶¶ 133, 134 [Defs.' Response to Plf.'s Statement of Additional Material Facts in Dispute].) Defendant Williams does not recall if she examined C.B.'s legs, feet, arms or hands. (Dkt. No. 130, at ¶ 153 [Defs.' Response to Plf.'s Statement of Additional Material Facts in Dispute].)

C.B.'s examination at the clinic lasted less than 15 minutes. (Dkt. No. 130, at ¶ 148 [Defs.' Response to Plf.'s Statement of Additional Material Facts in Dispute].) Defendant Williams received no further calls or complaints about C.B. on April 8, 2018, and she completed her shift at 5:00 p.m. (*Compare* Dkt. No. 120, Attach. 6, at ¶¶ 21, 22 [Defs.' Statement of Facts, asserting and citing admissible record evidence supporting these facts] *with* Dkt. No. 123,

Attach. 2, at ¶¶ 21, 22 [Plf.'s Response, admitting these facts or failing to cite admissible record evidence controverting them].) Defendant Williams did not follow up on C.B.'s condition in any way during the remainder of her shift; she did not alert an on-call provider to C.B.'s condition; and she did not order a medical bed check for C.B. on the night of April 8. (Dkt. No. 130, at ¶¶ 156, 158, 159 [Defs.' Response to Plf.'s Statement of Additional Material Facts in Dispute].)

Granted, the medical examiner opines that "[t]he night of his death, [C.B.] was in pulmonary edema and this can present in a subtle manner and sometimes with only diminished breath sounds at the lung bases which would require a very good clinician to find." (Dkt. No. 125, Attach. 18, at 3.) However, Plaintiff's nursing expert opines that, had Defendant Williams bothered to inquire into C.B.'s symptoms or conduct routine observations, she would have seen common warning signs of heart disease. (Dkt. No. 124, Attach. 8, at 14, 17.) Moreover, Plaintiff's testifying expert opines that (1) "[h]ad she examined [C.B.'s] lower extremities, Nurse Williams would have found pitting edema (indicating that [C.B.] was sicker than she had presumed," and (2) "[g]iven that [C.B.] was demonstrating heavy breathing when he arrived at the clinic, he would have been found to have an elevated respiratory rate and an increased respiratory effort, had Defendant Williams documented his respiratory rate. (Dkt. No. 125, Attach. 13, at 6.)

Under the circumstances – which involved the undisputed fact that Defendant Williams was informed by Leisa McKown that C.B. was having difficulty breathing, the undisputed fact that Williams observed C.B. breathing heavily, and the opinions of two experts that a further examination of C.B. by Williams would have yielded warning signs of heart disease – the Court

finds that a genuine dispute of material fact exists regarding whether Williams' conduct is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that Williams actually did not base the decision on such a judgment.

**b. Deliberate Indifference Standard**

Because the Court has found that Defendant Williams was a "professional" warranting the application of the substantial departure standard (and because the Court has found that a genuine dispute of material fact exists regarding whether Williams' conduct meets this standard), no need exists for the Court to alternatively consider whether Williams' conduct could reasonably be found to meet the deliberate indifference standard. The Court would only note its doubt that Williams' knowledge of C.B.'s difficulty breathing was extensive enough for her conduct to be reasonably found to fail to meet the deliberate indifference standard (which requires a mental state equivalent to criminal recklessness). *Cf. Butler v. Furco*, 614 F. App'x 21, 23 (2d Cir. 2015) ("[E]ven if Nurse Furco negligently failed to administer an EKG, negligence is not actionable under the Eighth Amendment . . . .").

**c. Qualified Immunity**

Based on the current record, the Court is unable to find that it was objectively reasonable for Defendant Williams at the time of the challenged action to believe her acts were lawful, because registered nurses of reasonable competence could disagree on the legality of her actions. Rather, the Court finds that, to make that determination, it needs a jury's responses to the Court's interrogatories at the end of trial, when it will revisit the issue.[9]

---

9 *See, e.g., Stephenson v. Do*e, 332 F.3d 68, 81 (2d Cir. 2003) (explaining that, after the district court receives "the jury['s] . . . deci[sion as to] what the facts were that the officer faced or perceived," the court then may "make the ultimate legal determination of whether qualified immunity attaches on those facts") (internal quotation marks omitted); *Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995) (finding that the ultimate question of entitlement to qualified immunity

**2. Negligence Claim**

In their papers, the parties appear to agree that Plaintiff's state claim against Defendant Williams is more accurately construed as sounding in medical malpractice rather than as sounding in simple negligence. (Dkt. No. 120, Attach. 7, at 23-25; Dkt. No. 122, at 29-30; Dkt. No. 153, Attach. 1, at 20-22]; Dkt. No. 156, at 34-35.) As a result, the Court will proceed to an evaluation of that medical-malpractice claim. In any event, even if the Court were to construe that claim as sounding in simple negligence, the Court would render the same conclusion for the same reasons.

**3. Medical Malpractice Claim**

Because the Court has found that Defendant Williams' conduct could be reasonably found to meet the substantial departure standard (and because that standard requires more than the standard governing a medical malpractice claim), the Court finds that Defendant Williams' conduct could be reasonably found to meet the medical malpractice standard. *See, e.g., Gillespie v. Nathan Littauer Hosp*., 248 A.D.3d 1577, 1578-80 (N.Y. App. Div., 3d Dep't 2026) (affirming trial court's denial of summary judgment to defendants on plaintiff's medical malpractice claim, accepting plaintiff's argument that the "nurses failed to take a complete medical history from decedent that would have disclosed risk factors for cardiac issues, neglected to properly recognize his symptoms and failed to order an electrocardiogram (hereinafter EKG) and a troponin test, which would have revealed a heart attack in progress on December 30, 2018"); *Serrano v. New York*, 117 N.Y.S.3d 748, 750 (N.Y. App. Div., 3d Dep't 2020) ("Following the trial, the Court of Claims found that the testimony of both cardiologists

---

is one of law for the court to decide "[o]nce disputed factual issues are resolved") (internal quotation marks omitted).

indicated that [the prison nurse] departed from accepted medical practice by failing to refer claimant to a physician or perform an EKG when he presented with chest and shoulder pain on his first visit to the treatment unit.”).

**C. Claims Against Defendant Corey C. Behlen**

**1. Substantive Due Process Claim**

**a. Substantial Departure Standard**

Plaintiff argues that Defendant Behlen was a “professional” for purposes of *Youngberg*, because he was competent, by training and experience, to make the particular decision at issue (i.e., to ensure that Defendant Sessions was conducting bed checks as required). (Dkt. No. 156, at 20.) Moreover, Plaintiff argues that Defendant Behlen’s supervision substantially departed from professional judgment because he saw Sessions watching movies but did nothing to reprimand her or instruct her to conduct the required bed checks (and indeed continued to watch television himself). (*Id*. at 28-29.)

Defendant Behlen, who does not appear in her motion papers to contest that he was a “professional” but did so during oral argument, argues that no reasonable fact-finder could find that his conduct on the early morning of April 9, 2018, shows a substantial departure from professional judgment, because (1) Behlen observed that Defendant Sessions was awake and alert inside "E" House at the time, (2) Behlen never saw Sessions watching a movie on her computer at the time, and (3) Behlen was never aware that Sessions had skipped the bed checks that she was expected to perform, and (4) Behlen may not, as a matter of law, be held liable for Sessions acts merely because he was her supervisor. (Dkt. No. 153, Attach. 1, at 25; Dkt. No. 158, at 6-7.)

It is undisputed that Corey Behlen, a Development Assistant 3, worked as Head of Shift at the Valley Ridge CIT for the evening and night shifts on April 8-9, 2018. (Dkt. No. 130, at ¶ 91 [Defs.' Response to Plf.'s Statement of Additional Material Facts in Dispute].) As Head of Shift, Behlen was responsible for supervising the Valley Ridge employees on duty at the time, including Sessions. (Dkt. No. 124, Attach. 15, at 22.) Behlen was in E-House from around 3:00 a.m. until 5:30 a.m. on April 9, 2018. (Dkt. No. 130, at ¶ 92 [Defs.' Response to Plf.'s Statement of Additional Material Facts in Dispute].) At approximately that time, he got something to eat and watched TV in the living room of the E-House. (Dkt. No. 130, at ¶ 93 [Defs.' Response to Plf.'s Statement of Additional Material Facts in Dispute].) Also at approximately that time, Sessions was either in the hallway or the office. (Dkt. No. 125, Attach. 15, at 16-17; Dkt. No. 123, Attach. 2, at ¶ 49 [Plf.'s Response, failing to cite record evidence controverting this fact].) Before then, Behlen had seen Sessions twice: the first time writing something at the desk; and the second time using e-mail on the E-House office computer. (Dkt. No. 130, at ¶ 94 [Defs.' Response to Plf.'s Statement of Additional Material Facts in Dispute]; Dkt. No. 121, Attach. 5, at 132.) Ordinarily, from the desk inside the "E" Building Office, employees can see into the hallway that runs outside the residents' bedrooms, and thus can see if residents have left their bedrooms. (*Compar*e Dkt. No. 120, Attach. 7, at ¶ 51 [Defs.' Statement of Facts, asserting and citing admissible record evidence supporting this fact] *with* Dkt. No. 123, Attach. 1, at ¶ 51 [Plf.'s Response, failing to cite citing admissible record evidence controverting this fact].) Behlen did not know if, during the time in question, Sessions had also been streaming movies. (Dkt. No. 125, Attach. 15, at 18.) He did not observe Sessions sleeping at any point. (*Compare* Dkt. No. 120, Attach. 7, at ¶ 50 [Defs.' Statement of Facts, asserting and

citing admissible record evidence supporting this fact] *with* Dkt. No. 123, Attach. 1, at ¶ 50 [Plf.'s Response, failing to cite citing admissible record evidence controverting this fact].)

Behlen allowed staff he supervised to watch television and movies during overnight shifts. (Dkt. No. 130, at ¶ 96 [Defs.' Response to Plf.'s Statement of Additional Material Facts in Dispute].) Behlen testified that, if he had seen Sessions watching movies on the E-House office computer, he would have asked her if she had something else to do, and then checked to make sure that she was doing what she was supposed to be doing (e.g., by making sure her paperwork was done). (Dkt. No. 125, Attach. 15, at 18-19.) At that time, Behlen did not check to see whether Sessions had completed her bed-check forms. (Dkt. No. 130, at ¶ 95 [Defs.' Response to Plf.'s Statement of Additional Material Facts in Dispute].)[10] However, again, Behlen did not know if Sessions had been streaming movies. (Dkt. No. 125, Attach. 15, at 18.)

Finally, granted, it bears repeating that, between approximately 3:00 a.m. and 5:00 a.m., Behlen spent his time getting something to eat and watching TV in E-House instead of supervising Sessions. (Dkt. No. 130, at ¶ 93 [Defs.' Response to Plf.'s Statement of Additional Material Facts in Dispute].) However, no evidence has been presented that, during the days before C.B.'s death, Behlen had been informed or notified by C.B.'s shortness of breath. (*See, e.g.,* Dkt. No. 121, Attach. 5, at 78-80, 87.)

Based on this record, the Court finds that, while it may be conceivable that a rational fact-finder could conclude that Defendant Behlen's conduct was a departure from professional judgment, no rational fact-finder could conclude that the conduct was such a *substantial*

---

[10] The Court notes that Sessions has admitted to lying on her bed-check forms. (Dkt. No. 124, Attach. 12, at 7-8; Dkt. No. 125, Attach. 5; Dkt. No. 125, Attach. 6, at 2.) However, it is not clear if Sessions made those representations at 3:00 a.m. and 5:00 a.m. or after she learned of C.B.'s death at approximately 6:30 a.m. (*Id.*)

departure from professional judgment, practice, or standards as to demonstrate that he actually did not base the decision on such a judgment. In rendering this finding, the Court relies on the fact that Behlen testified that (1) he permits staff to watch TV and movies in the office (if they have nothing else to do) to help them "stay awake," (2) "I'm not going to stand over somebody to do their bed checks, that's their job. I'm not going to stand over them to make sure they're doing their job," and (3) he fulfilled his supervisory duties by ensuring that Ashley Sessions was awake and alert. (Dkt. No. 121, Attach. 5, at 97-99.) This finding is no way undermined by the fact that, eight days after C.B.'s death, an employee of OPWDD sent an email to other employees of OPWDD, stating, in pertinent part, "As far as removing HOS duties for [Behlen] he as much stated he was sitting in E house for 3 hours, this [sic] can' be what the HOS duties entail. I strongly feel that he should be removed and trained in this, as . . . he clearly agreed he was not working up to standards." (Dkt. No. 125, Attach. 8, at 2 [Ex. Q to Shapiro Decl.].) Again, the standard is not whether there has been a departure or even whether there has been a "substantial" departure but whether there has been *such* a substantial departure from professional judgment, practice, or standards as to *demonstrate* that he actually did not base the decision on such a judgment. Though certainly not preferred, permitting staff to watch television to stay awake between performing their chores (which are not micromanaged) is a plausible managerial approach (demonstrating that the manager based his decision on his professional judgment).

**b. Deliberate Indifference Standard**

Because the Court has found that Defendant Behlen's conduct could not reasonably be found to meet the substantial departure standard (and because that standard requires less than the deliberate indifference standard), the Court finds that Defendant Behlen's conduct could not

reasonably be found to meet the deliberate indifference standard (which contains a required mental state that is akin to criminal recklessness).

**c. Qualified Immunity**

Because the Court has found that no reasonable juror could find Defendant Behlen liable on Plaintiff's substantive due process claim, the Court need not apply the doctrine of qualified immunity to that claim. The Court would add only that, if it were to apply that doctrine, the Court would find that, based on the current record, employees (specifically, Development Assistant 3s who worked as Heads of Shift) of reasonable competence could disagree on the legality of Defendant Behlen's actions.

**2. Negligence Claim**

The Court finds that a genuine dispute of material fact exists regarding whether Defendant Behlen's conduct could reasonably meet the standard for negligence for the same reason that the Court finds that a genuine dispute of material fact exists regarding whether Defendant Sessions' conduct could reasonably meet the standard for negligence. *See, supra*, Part III.A.2. of this Decision and Order.

**D. Claims Against Defendant Raymond J. McGinn**

**1. Substantive Due Process Claim**

**a. Substantial Departure Standard**

Plaintiff argues persuasively that Defendant McGinn does not dispute that he was a "professional" for purposes of *Youngberg*. (Dkt. No. 156, at 26 n.10; *see also* Dkt. No. 120, Attach. 7, at 19-21; Dkt. No. 153, Attach. 1, at 16-18.)

Plaintiff argues further that Defendant McGinn's treatment substantially departed from

professional judgment in the following ways: (1) by failing (as the lead medical provider at Valley Ridge) to establish and maintain open lines of communication between himself, the nursing staff, and direct care staff in order to have a clear picture of C.B.'s medical needs and symptoms (in particular by having no formal communication book for nurses to record their observations, by having no regularly scheduled meetings with nursing staff, by seldom meeting with direct care staff, by never instructed nurses to notify him about particular symptoms, by not having a regular practice of reviewing nursing notes, and by never reviewing direct care staff notes), which caused McGinn to never hear about C.B.'s increasing difficulty breathing and fatigue (as clear symptoms of heart failure); (2) by failing to implement "a plan to assure all clinical and non-clinical staff understand the diagnoses and symptoms of complications for each consumer," including C.B.; (3) by observing that C.B. had rapidly gained a significant amount of weight (despite being on a calorie-controlled diet and trying to lose weight) but doing nothing about it; and (4) by hearing C.B.'s complaint about nocturia but not recognizing it as a possible symptom of heart failure (despite knowing that C.B. had hypertension, which McGinn had diagnosed himself). (Dkt. No. 156, at 25-26.)

Defendant McGinn argues that no reasonable fact-finder could find that his interactions with C.B. on April 8, 2018, show a substantial departure from professional judgment, because (1) Plaintiff does not, and cannot, reasonably call into dispute that McGinn evaluated C.B., including his weight gain and urinary symptoms, and concluded, based on his professional judgment that these symptoms were related to C.B.'s antipsychotic medications, and (2) Plaintiff's speculation about what Defendant McGinn should have done, or what would have happened to C.B. if McGinn had exercised his judgment differently, is not relevant to the

professional judgment standard, which requires only that courts "make certain that professional judgment was in fact exercised," and presumes those judgments are correct. (Dkt. No. 153, Attach. 1, at 7-8, 16-18; Dkt. No. 158, at 3-5.)

Based on the current record, the following facts are undisputed. In 2018, McGinn worked as a family nurse practitioner at Valley Ridge. (Dkt. No. 123, Attach. 2, at ¶ 28 [Plf.'s Response, admitting this fact].) Individuals at Valley Ridge are weighed monthly. (*Id*. at ¶ 29.) McGinn's practice was to review resident's weight charts on an annual basis unless the nursing staff alerted him that a resident had gained more than ten pounds in a month. (*Id*. at ¶ 30.) Between December 2017 and April 2018, C.B. gained approximately 12.8 pounds. (Dkt. No. 120, Attach. 1, at ¶ 8 [McGinn Decl.]; Dkt. No. 121, at 1-2 [Ex. A to McGinn Decl.].)[11] In response to C.B.'s weight gain, McGinn encouraged C.B. to make healthy food choices and to increase physical activity. (*Compare* Dkt. No. 120, Attach. 8, at ¶ 32 [Defs.' Statement of Facts, citing admissible record evidence supporting this fact] *with* Dkt. No. 123, Attach. 2, at ¶ 32 [Plf.'s Response, failing to deny, or cite admissible record evidence controverting, this fact].) In addition, C.B. was placed on a calorie-controlled diet. (Dkt. No. 123, Attach. 2, at ¶ 33 [Plf.'s Response, admitting this fact].)

McGinn believed that C.B.'s weight gain was caused by his antipsychotic medications. (*Compare* Dkt. No. 120, Attach. 8, at ¶ 35 [Defs.' Statement of Facts, citing admissible record evidence supporting this fact] *with* Dkt. No. 123, Attach. 2, at ¶ 35 [Plf.'s Response, failing to

---

[11] The Court notes that in December 2017 C.B.'s weight was measured as 272.8 pounds, and that in April 2018 C.B.'s weight was initially measured as 294 pounds and then subsequently (upon re-weighing) measured as 285.6 pounds. (Dkt. No. 121, at 1-2 [Ex. A to McGinn Decl.]; Dkt. No. 125, Attach. 10, at 2-3 [Ex. W to Shapiro Decl.]; Dkt. No. 121, Attach. 6, at 17-18 [attaching pages "68" and "69" of McGinn Depo. Tr.].)

cite admissible record evidence controverting this fact].)[12] To ensure they were maintained at normal levels and were not contributing to his weight gain, McGinn performed routine monitoring of C.B.'s laboratory tests, including his renal function, lymphatic, electrolytes, and thyroid function. (*Compare* Dkt. No. 120, Attach. 8, at ¶ 36 [Defs.' Statement of Facts, citing admissible record evidence supporting this fact] *with* Dkt. No. 123, Attach. 2, at ¶ 36 [Plf.'s Response, failing to cite admissible record evidence controverting this fact].)[13]

McGinn does not recall observing any sign of fluid retention by C.B. over the last year of his life. (*Compare* Dkt. No. 120, Attach. 8, at ¶ 37 [Defs.' Statement of Facts, citing admissible record evidence supporting this fact] *with* Dkt. No. 123, Attach. 2, at ¶ 37 [Plf.'s Response, failing to cite admissible record evidence controverting this fact].)[14] Checking for signs of fluid retention is part of a physical exam, during which McGinn would look for "pitting" on the lower extremities which would indicate "edema," or fluid retention. (Dkt. No. 123,

---

[12] The Court notes that, rather than cite a portion of the record disputing the *nature* of McGinn's belief, Plaintiff cites a portion of McGinn's deposition regarding the *basis* for that belief, specifically, the portion of his deposition in which he responded, "No, not specifically" to the question, "Did you do anything to try to determine why C.B. was gaining weight at the rate he was during the last year of his life." (Dkt. No. 127, Attach. 7, at 31.)

[13] The Court notes that, rather than cite a portion of the record disputing the above-stated fact, Plaintiff again cites the portion of McGinn's deposition referenced in note 12 of this Decision and Order. However, that portion is immediately followed by testimony that *confirms* the above-stated fact, specifically, McGinn's explanation that "[u]nfortunately [weight gain] is a side effect of his medications and that's what I assumed it mostly was," and that to confirm that assumption McGinn ordered "the routine monitoring of [C.B.'s] labs to make sure that his renal function and his lymphatic function and his electrolytes were normal, that his thyroid was maintained at a formal level." (Dkt. No. 124, Attach. 7, at 31.)

[14] The Court notes that, rather than cite a portion of the record disputing the above-stated fact, Plaintiff cites a portion of McGinn's deposition *confirming* the above-stated fact, specifically, the portion of his deposition in which he responded, "I don't remember when my last physical exam[] with C.B. was" to the question, "Did you do anything to determine whether C.B. was retaining fluid during the last year of his life." (Dkt. No. 127, Attach. 7, at 31.)

Attach. 2, at ¶ 38 [Plf.'s Response, admitting this fact].) Part of McGinn's physical exam of patients is to check all extremities for pitting. (*Id.*) McGinn performed a physical exam of Plaintiff on January 15, 2018. (*Id.* at ¶ 38 [Plf.'s Response, failing to cite admissible record evidence controverting this fact, and indeed citing admissible record evidence confirming this fact].) During that exam, McGinn did not observe any signs of pitting or edema. (*Compare* Dkt. No. 120, Attach. 8, at ¶ 39 [Defs.' Statement of Facts, citing admissible record evidence supporting this fact] *with* Dkt. No. 123, Attach. 2, at ¶ 39 [Plf.'s Response, failing to cite admissible record evidence controverting this fact].)[15]

On January 15, 2018, C.B. complained of "nocturia," or the frequent need to rise at night to urinate. (Dkt. No. 123, Attach. 2, at ¶ 40 [Plf.'s Response, admitting this fact].) "Nocturia" is most typically caused by problems with the prostate or by a urinary tract infection. (*Compare* Dkt. No. 120, Attach. 8, at ¶ 41 [Defs.' Statement of Facts, citing admissible record evidence supporting this fact] *with* Dkt. No. 123, Attach. 2, at ¶ 41 [Plf.'s Response, failing to cite admissible record evidence controverting this fact].)[16] McGinn

---

[15] The Court notes that, rather than cite a portion of the record disputing the above-stated fact, Plaintiff cites McGinn's notes from his exam of January 15, 2018, and argues that they "do not say anything about examining C.B. for pitting or edema." (Dkt. No. 123, Attach. 2, at ¶ 39.) However, this argument is undermined by a fact already effectively admitted by Plaintiff: that "[p]art of McGinn's physical exam of patients is to check all extremities for pitting." (*Compare* Dkt. No. 120, Attach. 8, at ¶ 38 [Defs.' Statement of Facts, citing admissible record evidence supporting this fact] *with* Dkt. No. 123, Attach. 2, at ¶ 38 [Plf.'s Response, failing to specifically controvert, or cite admissible record evidence controverting, this fact].)

[16] The Court notes that, rather than cite a portion of the record disputing the above-stated fact regarding the *typical* cause of nocturia, Plaintiff generally cites a 29-page document to support an assertion regarding the *possible* cause of nocturia (specifically, Plaintiff's assertion that "[n]octuria can be a symptom of heart failure"). (Dkt. No. 123, Attach. 2, at ¶ 41 [Plf.'s Response, citing "Exhibit H"]; Dkt. No. 124, Attach. 8 [Ex. H to Shapiro Decl.].) Apart from being non-responsive, this general citation violates Local Rule 56.1(b), which requires that "[e]ach denial shall set forth a specific citation to the record where the factual issue arises."

examined C.B.'s prostate and found that it was not tender or enlarged. (Dkt. No. 123, Attach. 2, at ¶ 42 [Plf.'s Response, admitting this fact].) In addition, C.B's urine test was negative for infection. (*Id.* at ¶ 43 [Plf.'s Response, admitting this fact].) Moreover, C.B. did not complain of "dysuria," or painful urination, which is a symptom commonly associated with a kidney or urinary tract infection. (*Id.* at ¶ 44 [Plf.'s Response, admitting this fact].) McGinn believed that C.B. may be experiencing urinary symptoms related to his antipsychotic medications. (*Compare* Dkt. No. 120, Attach. 8, at ¶ 45 [Defs.' Statement of Facts, citing admissible record evidence supporting this fact] *with* Dkt. No. 123, Attach. 2, at ¶ 45 [Plf.'s Response, failing to controvert, or cite admissible record evidence controverting, this fact].) McGinn prescribed tamsulosin, a medication that relaxes the prostate to promote more complete emptying of the bladder. (Dkt. No. 123, Attach. 2, at ¶ 46 [Plf.'s Response, admitting this fact].)

Having recited the undisputed facts, the Court turns now to a disputed one, which regards whether Defendant McGinn possessed a duty to put a system of communication in place at Valley Ridge. In his deposition, McGinn testified that, as a "medical provider" (nurse practitioner) employed at Valley Ridge in 2018, he "was not expected [by his employer] to put in place systems [of communication] to allow [him] to ensure [he had been] notified of a resident's acute medical needs." (Dkt. No. 124, Attach. 7, at 21 [attaching page 39 of Depo. Tr. of McGinn].) Plaintiff attempts to controvert this fact with the opinion of her expert, Georgia Persky, that, as Valley Ridge's *sole* nurse practitioner (and thus its lead medical care provider), McGinn had an inescapable duty to ensure that Valley Ridge CIT had communication systems "in place to notify the nursing staff and, if necessary, [himself] about medical issues occurring with Valley Ridge [CIT] residents." (Dkt. No. 124, Attach. 8 [Ex H to Shapiro Decl.].)

However, upon close examination, this particular opinion of Ms. Persky's must be admitted to have little relevance. This is because her opinion is not based on any of the numerous documents constituting the employment agreement between OPPWD and Defendant McGinn (or even a facility-specific job description, organizational chart, or nursing policy). (*See* Dkt. No. 128, Attach. 8, at 6 [attaching list of documented reviewed].) Rather, her opinion is based on McGinn's (purported) inherent duty as the *ranking* medical care provider on site to *voluntarily assume* such a duty (if it was not contractually imposed by his employer). (*See id*. at 15 [opining that "Raymond McGinn, as the sole nurse practitioner assigned to Valley Ride, failed to ensure that communication systems were in place to notify staff and, if necessary, Mr. McGinn, about medical issues occurring with Valley Ridge Residents" and citing pages 39 through 44 of McGinn's own deposition testimony, which flatly controvert the assertion].) The problem is that, any ethical duty that McGinn may have had as the ranking nurse on site does not appear as relevant to Plaintiff's failure-to-ensure-communication claim as the terms of Defendant McGinn's employment agreement with OPPWD (which could well have tasked another employee with that particular duty, such as an off-site supervising physician, or could possibly have failed to task anyone with it). This is because Plaintiff expressly asserts his claims against Defendant McGinn based on actions taken in his "capacity" as "an employee of OPPWD." (Dkt. No. 25, at ¶ 13.) As a result, the most relevant admissible evidence that a jury would have on the subject (of whether McGinn had a duty as an employee to put in place a system of communication at Valley Ridge) would be the above-stated deposition testimony of Defendant McGinn.

Based on this record, the Court finds that, while it may be conceivable that a rational

fact-finder could conclude that Defendant McGinn's conduct was a departure from professional judgment, no rational fact-finder could conclude that the conduct was such a *substantial* departure from professional judgment, practice, or standards as to demonstrate that he actually did not base the decision on such a judgment. In rendering this finding, the Court relies on (1) the most relevant evidence regarding whether McGinn had an actionable duty to set up a communication system, (2) the plausible basis for McGinn's belief regarding the cause of C.B.'s rapid weight gain and complaints of nocturia (as being side effects his antipsychotic medications), and (3) the Second Circuit's pronouncement that "[t]he requirement that professional judgment be exercised is not an invitation to a court reviewing it to ascertain whether in fact the best course of action was taken." *P.C. v. McLaughlin*, 913 F.2d 1033, 1043 (2d Cir. 1990).

**b. Deliberate Indifference Standard**

Because the Court has found that Defendant McGinn's conduct could not reasonably be found to meet the substantial departure standard (and because that standard requires less than the deliberate indifference standard), the Court finds that Defendant McGinn's conduct could not reasonably be found to meet the deliberate indifference standard (which contains a required mental state that is akin to criminal recklessness).

**c. Qualified Immunity**

Because the Court has found that no reasonable juror could find Defendant McGinn liable on Plaintiff's substantive due process claim, the Court need not apply the doctrine of qualified immunity to that claim. However, were it to do so, the Court would find that qualified immunity applies here as a matter of law, based on the current record, under the standard set

forth above in Part II.B.1.c. of this Decision and Order: a nurse practitioner of reasonable competence could find McGinn's actions legal.

**2. Negligence Claim**

In their papers, the parties appear to agree that Plaintiff's state claim against Defendant McGinn is more accurately construed as sounding in medical malpractice rather than as sounding in simple negligence. (Dkt. No. 120, Attach. 7, at 23-25; Dkt. No. 122, at 29-30; Dkt. No. 153, Attach. 1, at 20-22]; Dkt. No. 156, at 34-35.) As a result, the Court will proceed to an evaluation of that medical-malpractice claim. In any event, even if the Court were to construe that claim as sounding in simple negligence, the Court would render the same conclusion for the same reasons.

**3. Medical Malpractice Claim**

Defendant McGinn argues that he is also entitled to judgment as a matter of law on Plaintiff's state-law medical malpractice claim against him because, based on the current record, no reasonable fact-finder could conclude that his conduct meets the medical malpractice standard for the following reasons: (1) Plaintiff's expert report by Dr. Bruce Charash contains no reference to McGinn at all, much less any proof that McGinn's actions departed from the standard of medical care; (2) while Plaintiff's expert report by Georgia Persky references an alleged failure of "leadership" by McGinn to ensure communication among staff about patients' health concerns, Persky's opinion relies only selectively on McGinn's deposition testimony, ignoring McGinn's testimony that (a) he was not responsible, as a family nurse practitioner, for implementing OPWDD communication systems or forms, and (b) staff had "very good working communication between nurses and [his] office," including an informal notebook for off-shift

nurses to write down concerns that McGinn would review. (Dkt. No. 153, Attach. 1, at 20-22; Dkt. No. 158, at 8.)

Although Defendant McGinn's argument (and deposition testimony) that he has no responsibility for implementing OPWDD communication systems is well taken, the Court finds that his conduct in failing to follow-up (regarding C.B.'s rapid weight gain and complaints of nocturia) and diagnose C.B.'s heart condition could be reasonably found – albeit barely – to meet the medical malpractice standard. (Dkt. No. 128, Attach. 8, at 15, 17 [Affirmative Opinion of Georgia Persky, regarding purported failure of nursing staff to, among other things, follow-up on C.B.'s health concerns until resolved].) For example, after his examination of C.B. on January 15, 2018, McGinn examined C.B. on February 20, 2018, regarding an area of redness on his cheek. (Dkt. No. 130, at ¶ 57 [Defs.' Response to Plf.'s Statement of Additional Material Facts in Dispute]; Dkt. No. 121, Attach. 6, at 22-23 [attaching pages "88" through "91" of McGinn Depo. Tr.]; Dkt. No. 121, Attach. 2, at 2 [attaching Physician's Order Form]; Dkt. No. 121, Attach. 1, at 4 [attaching Unit Physician Notes].) However, no mention of C.B.'s weight or nocturia is mentioned in McGinn's notes from that second examination. (*Id.*) At the time of that examination, C.B.'s weight had increased approximately 6.6 pounds since December 2017 (specifically, from 272.8 pounds to 279.4 pounds), despite being on both a calorie-controlled diet and tamsulosin. (Dkt. No. 121, at 1 [Ex. A to McGinn Decl.]; Dkt. No. 125, Attach. 10, at 2 [Ex. W to Shapiro Decl.]; *cf.* Dkt. No. 125, Attach. 15, at 4 [attaching Nursing Notes].) Moreover, on February 26, 2018, McGinn stopped C.B.'s tamsulosin due to a potential interaction between that drug and fluoxetine, and noted that he would "monitor [C.B.] for nocturia." (Dkt. No. 121, Attach. 6, at 23 [attaching pages "89" and "90" of McGinn Depo.

Tr.]; Dkt. No. 121, Attach. 1, at 4 [attaching Unit Physician Notes]; Dkt. No. 121, Attach. 2, at 3 [attaching Physician's Order Form].) However, McGinn did not examine C.B. again, even though (1) the Nursing Notes from March 2018 contain an indication of continued nocturia, (2) in March 2018, C.B.'s weight had increased approximately 11.5 pounds since December 2017 (specifically, from 272.8 pounds to 284.3 pounds), again despite being on a calorie-controlled diet, and (3) McGinn knew C.B. had been diagnosed with hypertension. (Dkt. No. 125, Attach. 15, at 5 [attaching Nursing Notes from 03/15/18; Dkt. No. 121, at 1-2 [Ex. A to McGinn Decl.]; Dkt. No. 125, Attach. 10, at 2-3 [Ex. W to Shapiro Decl.]; Dkt. No. 130, at ¶ 22, 120 [Defs.' Response to Plf.'s Statement of Additional Material Facts in Dispute, admitting knowledge].)

Simply stated, while the Court continues to find that no rational fact-finder could conclude that McGinn's conduct was such a *substantial* departure from professional judgment, practice, or standards as to demonstrate that he actually did not base the decision on such a judgment (for purposes of substantive due process claim), the Court finds that a rational fact-finder could conclude – again, albeit barely – that McGinn's conduct was a departure from accepted practice (for purposes of a medical malpractice claim).

## E. Claims Against Defendant Katherina L. Cassata

### 1. Substantive Due Process Claim

#### a. Substantial Departure Standard

Plaintiff argues that Defendant Cassata does not dispute that she was a "professional" for purposes of *Youngberg*. (Dkt. No. 156, at 27 n.10.) However, Defendant Cassata's briefing does not appear to support that argument. (Dkt. No. 120, Attach. 7, at 8, 21; Dkt. No. 153, Attach. 1, at 9, 18.) Indeed, in her supplemental reply memorandum of law, Cassata argues that

the professional judgment standard does not apply to her. (Dkt. No. 158, a 7.) Furthermore, she repeated that position during oral argument. As a result, the Court must begin by analyzing that issue.

As of April 2018, Defendant Cassata had been a Developmentally Disabled Secure Care Treatment Aide ("DDSCTA") for approximately eight years. (Dkt. No. 121, Attach. 7, at 13, 20.) Granted, in that position, she never received training from OPWDD on how to examine a patient's lungs or identify symptoms of heart failure. (*Id*. at 21.) However, she was "certified to pass medications and take vitals on individuals and perform first-aid." (*Id*. at 20.) More important, she was trained regarding (1) when she was required to refer to a nurse the observable health concerns of, or complaints by, a service recipient, and (2) when she was required to fill out various forms and documents. (*Id*. at 22-25.) Under the circumstances, the Court finds that a jury could reasonably find that Defendant Cassata was a "professional" for purposes of *Youngberg* because she was competent, due to her training or experience, to notify nursing staff of any service recipient's health concerns and document those concerns.

Plaintiff argues that Defendant Cassata's treatment substantially departed from professional judgment for the following reasons: (1) Cassata saw C.B. unable to complete a basic, non-strenuous task (vacuuming) on two occasions, including two days before his death, and on both occasions C.B. told Cassata he could not breathe and was having chest pains; (2) C.B.'s Plan of Nursing Services required Cassata to report if C.B. had increased difficulty tolerating activity, complained of shortness of breath, or was tiring easily; and (3) however, it is at least a disputed fact whether Cassata reported or documented any of C.B.'s symptoms. (Dkt. No. 156, at 27-28.)

Defendant Cassata argues that no reasonable fact-finder could find that her interactions with C.B. on April 6 and/or April 8, 2018, show a substantial departure from professional judgment, because (1) it is undisputed that "Cassata did relay her observations about C.B., including having difficulty completing his chores, to nursing staff," and (2) instead of disputing this fact, Plaintiff argues that Cassata did not adequately document her observations despite invoking nursing staff's assistance based on those same observations. (Dkt. No. 158, at 7.)

The problem is that it is difficult to agree with Defendant Cassata that, based on the admissible record evidence, it is *undisputed* that she relayed to nursing her observations about C.B., including about him having difficulty completing his chores. Rather, the following facts are undisputed based on the current record. On April 4, 2018, Defendant Katherina Cassata, a Developmentally Disabled Secure Care Treatment Aide ("DDSCTA"), observed C.B. complain that he could not complete his assigned chore of vacuuming because of chest pain and difficulty breathing. (Dkt. No. 121, Attach. 7, at 14, 54-56.) At the time, C.B. "physically . . . looked okay" to Cassata. (*Id*. at 56.)

Granted, Cassata testified that she notified nursing of C.B.'s complaint by calling the cell phone of the nurse on duty that day, who asked Cassata to take C.B.'s vitals. (*Id*. 57-64.) Cassata testified she did so, including C.B.'s blood pressure, and wrote them down on a paper towel to save for her "DAR" note later. (*Id*. at 58, 75.)[17] Cassata testified that she communicated those vitals to the nurse in a subsequent call, and that the nurse said she would come down and check C.B. out. (*Id*. at 58.) Cassata testified that she believed this nurse may have been Anita Baral, although she is not certain. (*Id*. at 61, 63, 64. 75.) Cassata also testified

17 "DAR" stands for "Data," "Action" and "Response." (*See, e.g.*, Dkt. No. 125, Attach. 4, at 4.)

that, when the nurse came down to examine C.B. that day, she gave nurse the paper towel on which Cassata had written C.B.'s vitals so that the nurse would have them for her nursing notes. (*Id.* at 75.)[18]

However, Ms. Baral testified that she could not recall the existence of any such phone call or handwritten paper towel from Cassata, or examination by Baral of C.B. (Dkt. No. 124, Attach. 11, at 48-50; Dkt. No. 93, Attach. 5, at 7.) Moreover, Cassata testified that, in fact, she did not end up documenting C.B.'s vital signs in a "DAR" note that day. (Dkt. No. 121, Attach. 7, at 75-76.)

Similarly, on April 8, 2018, Cassata observed C.B. have to sit down in a chair while trying to vacuum, "like scooching himself along." (Dkt. No. 121, Attach. 7, at 62-64.) At the time, C.B. again complained to Cassata that he could not breathe. (*Id.* at 55-56.) In addition, he "looked physically sick" to Cassata in that "[h]e had no color. He was sweating. He was clammy to the touch. He was out of breath." (*Id.* at 55, 57.)

Granted, again, Cassata testified that, as a result, she again called nursing, and that this time Cassata told Baral that "it was serious. . . . [T]his isn't like him. . . . [H]e's sitting here in the med room door sweating." (*Id.* at 58, 70, 77.) In response, Cassata testified, Baral came and examined C.B. on April 8, 2018. (Dkt. No. 121, Attach. 7, at 62, 70.) When Baral did so, Cassata testified, Baral did not take C.B.'s vital signs, use a stethoscope, or examine his lungs; and she did not ask him how long he had been feeling that way. (*Id.* at 70-71.) Instead, Cassata testified, Baral "just looked at him and patted him," then she said something "like you'll

18 The Court notes that Cassata testified that Cameron Houck was present when Baral came down to examine C.B. on April 4, 2018. (Dkt. No. 121, Attach. 7, at 78-79.) However, the record does not appear to contain a declaration or transcript of the deposition of Cameron Houck. (*See generally* Docket Sheet.)

be okay, C.B., go get some water and lay down, and that's what he did." (*Id*. at 53, 62, 66, 70, 74.) According to Cassata, Baral said to her, "I know, I know [the matter is serious]. He has to lose weight." (*Id*. at 66.) Finally, Cassata testified that she recorded her observations of C.B., and contacts with nursing, in a "DAR" note in the "end of shift" report that she wrote. (*Id*. at 64-65, 76-77.)

However, again, according to Ms. Baral, she does not recall any such phone call or examination having occurred. (Dkt. No. 124, Attach. 11, at 48-50.) Furthermore, the record appears to contain no such "end of shift" report. (*See generally* Dkt. No. 125, Attach. 4 [Ex. J to Shapiro Decl.]; Dkt. No. 125, Attach. 15 [Ex. DD to Shapiro Decl.].)

As a result, based on the current record, the Court finds that a jury could reasonably find (albeit barely) that Defendant Cassata's conduct in communicating and documenting C.B.'s health concerns (or failing to do so) was such a substantial departure from professional judgment, practice, or standards as to demonstrate that she actually did not base her decisions on such a judgment. The Court explains that it perceives this question to be a close one, because Cassata's deposition testimony on the subject is detailed, while Baral's disputation of whether she was called by Cassata appears based merely on a lack of recollection of events and/or lack of notes regarding such a call. (*See, e.g.,* Dkt. No. 124, Attach. 11, at 48-40 [answering, "No, I don't remember. No" to the question, "In April of 2018, did Ms. Cassata report to you that C.B. was not feeling well," and answering, "I don't remember who complained about C.B., but I don't see my notes, and I don't remember, so it's no" to the question, "Did Ms. Cassata report to you at any time that C.B. was not feeling well?"].) Such a conflict between admissible record evidence is for a jury to resolve.

**b. Deliberate Indifference Standard**

Because the Court has found that Defendant Cassata was a "professional" warranting the application of the substantial departure standard (and because the Court has found that a genuine dispute of material fact barely exists regarding whether Cassata's conduct meets this standard), no need exists for the Court to alternatively consider whether Cassata's conduct could reasonably be found to meet the deliberate indifference standard. The Court would note only that it expresses doubt that Cassata's conduct to be reasonably found to meet the deliberate indifference standard (which requires a mental state equivalent to criminal recklenessness). *Cf. Butler v. Furco*, 614 F. App'x 21, 23 (2d Cir. 2015) ("[E]ven if Nurse Furco negligently failed to administer an EKG, negligence is not actionable under the Eighth Amendment . . . .").

**c. Qualified Immunity**

Based on the current record, the Court is unable to find that it was objectively reasonable for Defendant Cassata at the time of the challenged action to believe her acts were lawful, because no Developmentally Disabled Secure Care Treatment Aide of reasonable competence could find her actions legal (e.g., if that person were to credit Anita Baral's testimony). Rather, the Court finds that, to make that determination, it needs a jury's responses to the Court's interrogatories at the end of trial, when it will revisit the issue.

**2. Negligence Claim**

In their papers, the parties appear to agree that Plaintiff's claim against Defendant Cassata is more accurately construed as sounding in negligence rather than as sounding in medical malpractice. (Dkt. No. 120, Attach. 7, at 8, 21; Dkt. No. 122, at 23-24, 29-31; Dkt. No. 153, Attach. 1, at 9, 18, 26; Dkt. No. 156, at 34-35.) As a result, the Court will proceed to an

evaluation of that negligence claim. In any event, even if the Court were to construe that claim as sounding in medical malpractice, the Court would render the same conclusion for the same reasons.

Based on the current record, the Court finds that a genuine dispute of material fact exists – again, albeit barely – regarding whether Defendant Cassata's conduct could reasonably meet the standard for negligence for the same reason that the Court finds that a genuine dispute of material fact exists regarding whether Defendant Cassata' conduct could reasonably meet the substantial departure standard. *See, supra*, Part III.E.1.a. of this Decision and Order.

**F. Claims Against Defendant Michael Novack**

**1. Substantive Due Process Claim**

**a. Substantial Departure Standard**

Plaintiff argues that Defendant Novack was a "professional" for purposes of *Youngberg*, because of his training and experience, working continuously at OPWDD as a DDSCTA 2 for 14-15 years. (Dkt. No. 156, at 23, n.8.) The Government argues, both in its motion papers and during oral argument, that the professional judgment standard does not apply to Defendant Novack. (Dkt. No. 158, at 5.)

After carefully considering the matter, the Court finds that a jury could reasonably find that Defendant Novack was a "professional" for purposes of *Youngberg* because he was competent, due to his 14-15 years' of training or experience, in supervising the direct care staff that worked in the Valley Ridge CIT E-House. (Dkt. No. 130, at ¶ 6.) These duties included being responsible for "check[ing] the paperwork" in E-House, including the daily activity notes (also known as "DAR" notes), shift reports, and 24-hour reports, and "mak[ing] sure that it's

being completed." (*Id*. at ¶ 110.)

Plaintiff argues further that Defendant Novack's treatment substantially departed from professional judgment in the following ways: (1) by failing to document, and maintain communication among his staff about, C.B.'s health concerns; and (2) by failing to respond to C.B.'s medical complaints. (Dkt. No. 156, at 23-25.)

The following facts are undisputed based on the current record. In April 2018, Novack was a Developmentally Disabled Secure Care Treatment Aide ("DDSCTA") at Valley Ridge CIT. (Dkt. No. 130, at ¶ 5.) He had worked for OPWDD continuously since 2002 and was promoted to a DDSCTA 2 in or around 2018. (*Id*.) In April 2018, Novack was responsible for supervising all the staff that worked in the Valley Ridge CIT E-House. (*Id*. at ¶ 6.)

Novack never looked at C.B.'s Plan of Nursing Services, even though it was kept in a book in E-House. (*Id*. at ¶ 7.) Novack never instructed the staff he supervised to follow C.B.'s Plan of Nursing Services. (*Id*. at ¶ 8.) Moreover, Novack does not remember ever having a conversation with anyone at OPWDD regarding C.B.'s weight gain. (*Id*. at ¶ 12; *see also* Dkt. No. 124, Attach. 4, at 13 [attaching page "67" of Novack's Depo. Tr.].)

In April 2018, OPWDD policy required Valley Ridge CIT staff to do "focus charting." (Dkt. No. 30, at ¶ 10.) In his deposition, Novack testified that he did not recall having ever heard the term "focus charting." (*Id*. at ¶ 11; *see also* Dkt. No. 124, Attach. 4, at 12 [attaching page "63" of Novack's Depo. Tr.].)

In the weeks before C.B.'s death, C.B. told Novack he was not going to class because he was tired. (*Id*. at ¶ 125.) In addition, someone told Novack that C.B. had been lethargic. (*Id*. at ¶ 127.) However, Novack did not document anywhere that he had been told C.B. had been

lethargic. (*Id*. at ¶ 128.)

On the morning before he died, C.B. complained to Novack that he was having difficulty breathing. (*Id.* at ¶ 137.) Indeed, a non-party witness (Samantha Feliciano) testified that she heard C.B. tell Novack, "I'm feel something's wrong. I need to go to the hospital." (*Id*. at ¶ 143; *see also* Dkt. No. 124, Attach. 28, at 4 attaching page "9" of Feliciano's Depo. Tr.].) Moreover, later that morning, J.M. called Novack to tell him C.B. was having problems breathing and could not urinate. (Dkt. No. 130, at ¶ 136.) However, Novack did not make any written notes of C.B.'s symptoms or complaints, or of J.M.'s call. (*Id*. at ¶¶ 136-37.) Instead, Novack testified in his deposition that, after each communication, he contacted nursing to report C.B.'s complaints. (Dkt. No. 124, Attach. 4, at 19-20 [attaching pages "119" and "120" of Novack's Depo. Tr.].) Meanwhile, Defendant Williams testified in her deposition that she does not remember Novack notifying her of C.B.'s complaints. (Dkt. No. 124, Attach. 6, at 39-41 [attaching pages 195-97 of Def. Williams' Depo. Tr.].)

Under these circumstances, the Court finds that, based on the current record, a jury could reasonably find that Defendant Novack's conduct – specifically, his conduct in supervising the direct care staff in the Valley Ridge CIT E-House through, among other things, checking and ensuring the completion of the necessary paperwork (or failing to do so) – was such a substantial departure from professional judgment, practice, or standards as to demonstrate that he actually did not base his decisions on such a judgment.

**b. Deliberate Indifference Standard**

Because the Court has found that Defendant Novack was a "professional" warranting the application of the substantial departure standard (and because the Court has found that a genuine

dispute of material fact exists regarding whether Novack's conduct meets this standard), no need exists for the Court to alternatively consider whether Novack's conduct could reasonably be found to meet the deliberate indifference standard (which contains a required mental state that is akin to criminal recklessness).

**c. Qualified Immunity**

Based on the current record, the Court is unable to find that it was objectively reasonable for Defendant Novack at the time of the challenged action to believe his acts were lawful, because no Developmentally Disabled Secure Care Treatment Aide of reasonable competence could disagree on the legality of Novack's actions. Rather, the Court finds that, to make that determination, it needs a jury's responses to the Court's interrogatories at the end of trial, when it will revisit the issue.

**2. Medical Malpractice Claim**

Plaintiff appears to argue that her state claim against Defendant Novack is more accurately construed as sounding in medical malpractice rather than as sounding in simple negligence; and she withdraws that medical malpractice claim against Defendant Novack. (Dkt. No. 156, at 34, n.14 [attaching page "29" of Plf.'s Supplemental Opp'n Memo. of Law].) Regardless of whether the Court were to review and approve the terms of this request under Fed. R. Civ. P. 41(a)(2), or whether the Court would evaluate the facial merit of Defendants' unopposed request to dismiss this state claim, the Court finds these inquires would result in the same outcome: the dismissal without prejudice of this claim.

**ACCORDINGLY**, it is

**ORDERED** that Defendant Ashley Sessions' supplemented motion for summary

judgment (Dkt. Nos. 118 and 152) is **GRANTED in part** and **DENIED in part** such that Plaintiff's substantive due process claim against Sessions is **DISMISSED**, while her negligence claim against Sessions **SURVIVES** for trial; and it is further

**ORDERED** that the remaining Defendants' supplemented motion for summary judgment (Dkt. Nos. 120 and 153) is **GRANTED in part** and **DENIED in part** such that

(1) Plaintiff's substantive due process claim and negligence claim against Defendant Elise M. Williams **SURVIVE** for trial,

(2) Plaintiff's substantive due process claim and negligence claim against Defendant Corey C. Behlen are **DISMISSED** (and the Clerk of Court shall **TERMINATE** Behlen as a Defendant),

(3) Plaintiff's substantive due process claim against Defendant Raymond J. McGinn is **DISMISSED**, while her negligence claim against McGinn **SURVIVES** for trial,

(4) Plaintiff's substantive due process claim and negligence claim against Defendant Katherina L. Cassata **SURVIVE** for trial, and

(5) Plaintiff's medical malpractice claim against Defendant Michael Novack is **DISMISSED without prejudice**, while her substantive due process claim against Novack **SURVIVES** for trial.

Dated: September 21, 2026
Syracuse, New York

Glenn T. Suddaby
U.S. District Judge